VON MOLTKE v. GILLIES, SUPERINTENDENT OF
THE DETROIT HOUSE OF CORRECTION.

No. 73.   Argued November 20, 1947.—Decided January 19, 1948.

*G. Leslie Field* argued the cause and filed a brief for petitioner.

*Frederick Bernays Wiener* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Robert S. Erdahl* and *Philip R. Monahan.*

MR. JUSTICE BLACK announced the judgment of the Court and an opinion in which MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE concur.

The petitioner was indicted for conspiracy to violate the Espionage Act of 1917.[1] The specific charge was that, in order to injure the United States and to aid the German Reich, she and twenty-three others had conspired during the second World War to collect and deliver vital military information to German agents.

With no money to hire a lawyer and without the benefit of counsel the petitioner appeared before a federal district judge, told him that the indictment had been explained to her, signed a paper stating that she waived the "right to be represented by counsel at the trial of this cause," and then pleaded guilty. Under her plea she could have been sentenced to death or to imprisonment for not more than thirty years. After thirteen months in jail following her plea, the court sentenced her to four years in prison.

In this habeas corpus proceeding she charged that the sentence, resting as it did solely on her plea of guilty,

[1] Section 32 defines the substantive crime of espionage. Section 34 declares conspiracies to violate § 32 to be unlawful. 40 Stat. 217, 50 U. S. C. §§ 32, 34.

was invalid for two reasons: First, she alleged that the plea was entered by reason of the coercion, intimidation, and deception of federal officers in violation of the due process clause of the Fifth Amendment. Second, she alleged that she neither understandingly waived the benefit of the advice of counsel nor was provided with the assistance of counsel as required by the Sixth Amendment. As the Government concedes, these charges entitle the petitioner to have the issues heard and determined in a habeas corpus proceeding, and, if true, invalidate the plea and sentence.[2] The District Court heard evidence offered by both the petitioner and the Government, and then found that she had failed to prove either contention. 72 F. Supp. 994. The Sixth Circuit Court of Appeals affirmed, with one judge dissenting. 161 F. 2d 113.

On the basis of what he designated as "the undisputed evidence," the dissenting judge concluded that petitioner had pleaded guilty because of her reliance upon the legal advice of a Federal Bureau of Investigation (FBI) lawyer-agent, which advice "was, though honestly given, false." Neither the District Court nor the majority of the Circuit Court of Appeals controverted this conclusion of the dissenting judge. A challenge to a plea of guilty made by an indigent defendant, for whom no lawyer has been provided, on the ground that the plea was entered in reliance upon advice given by a government lawyer-agent, raises serious constitutional questions. Under these circumstances we granted certiorari in this case. 331 U. S. 800.

It thus becomes apparent that determination of the questions presented depends upon what the evidence showed. There was conflicting testimony on many points

---

[2] *Waley* v. *Johnston,* 316 U. S. 101; *Walker* v. *Johnston,* 312 U. S. 275, 286; *Johnson* v. *Zerbst,* 304 U. S. 458, 467; cf. *Sunal* v. *Large,* 332 U. S. 174, 177.

in this case. We do not attempt to resolve these conflicts. Our conclusion is reached from the following facts shown by the testimony of government agents or by undisputed evidence offered by petitioner.

The petitioner was born in Germany. In that country she bore the title of countess. She and her husband came to the United States in December, 1926. Since 1930 they have lived in Detroit where the petitioner has been a housewife and her husband an instructor in German at Wayne University. Her husband is a naturalized citizen of the United States; her own naturalization papers have been pending for some time. They have four children, three of whom were born in this country as American citizens.

August 24, 1943, between 6 and 7 a. m., six FBI agents came to their home. The petitioner was in bed. She was informed that she must get up and go with them. The home was searched with her husband's permission. She was taken to the local office of the FBI, fingerprinted, photographed, and examined by a physician. From there she was taken to the Immigration Detention Home, placed in solitary confinement, and, with one exception noted below, not permitted to see or communicate with anyone outside for the next four days. Two FBI agents persistently but courteously examined her every day from about 10 a. m. until about 9 p. m. She knew nothing about her arrest and detention except that she was being held indefinitely on a presidential warrant "as a dangerous enemy alien." She was informed "that the FBI is an investigating agency, and not a prosecuting, and as an enemy alien I [she] was not allowed to see an attorney." During this first period of questioning, the only relaxation of petitioner's incommunicado status was a single permission to relay instructions through an FBI agent to her husband who was told how to look after their nine-year-old diabetic child. This child, for whom the mother had

specially cared since his infancy, required a strict diet and injections twice daily.

September 1, eight days after her early morning arrest, petitioner was taken before an Enemy Alien Hearing Board. She was not then informed of any specific charges against her, but she was told that she could not be "represented by a legal attorney" at the hearing. The results of this hearing were not made known to her. At its conclusion she was returned to the detention home.

September 18 the petitioner was handed the indictment against her. In our printed record this document covers a little more than fourteen pages. It charges generally, in the language of the statute, that the twenty-four defendants conspired to violate the statute. It also enumerates 47 overt acts alleged to have been performed in pursuance of the objects of the conspiracy, five of which acts specifically refer to the petitioner. Four out of the five merely allege that the petitioner "met and conferred with" one or more of the other defendants; the fifth alleges that she "introduced" someone to one of the defendants.

September 21, almost a month after her arrest, the petitioner and a co-defendant, Mrs. Leonhardt, were taken to the courthouse for arraignment. Upon being told that the two defendants had no attorney and no means to obtain one, the judge said he would appoint counsel right away and would not arraign them until they had seen an attorney. They were then led "to the bull pen to wait for the attorney." Before any attorney arrived they were taken back into the courtroom. Court was in session. As explained by petitioner and corroborated by others, "Judge Moinet was on the bench, and there seemed to be a trial going on, because Judge Moinet appointed a lawyer in the courtroom. He said, 'Come here, "so-and-so", and help these two women out,' and the young lawyer objected to that; he said he didn't want to have anything to do with

that. But then he consented just for the arraignment, to help out, and he came over to us—we were sitting on the side bench—and he asked me, 'How do you want to plead?' I said, 'Not guilty.' And he asked Mrs. Leonhardt, and she said the same thing. So he told us that, he whispered to us, in fact, he went over it, whispered that it would not be advisable, but I do not know even now why, but he suggested it would be proper to stand mute." In this two to five minute whispered conversation (the lawyer said "a couple of minutes") the lawyer asked both defendants if they "understood what this was all about." They indicated that they did. He did not even see the indictment, did not inform the petitioner as to the nature of the charge against her or as to her possible defenses, and did not inquire if she knew the punishment that could be imposed for her alleged offense. The case on trial was then interrupted, the charge was made against the defendants, who stood mute, and a plea of not guilty was entered. With reference to their future representation by an attorney, the petitioner's uncontradicted testimony was that the judge "said he would appoint an attorney right away, and I understood that the gentleman was to be expected to come right away."

The two women, unable to get out on bond, were then immediately taken from the courthouse to the Wayne County jail. The matron there informed the petitioner that she had strict orders to hold the petitioner and Mrs. Leonhardt "incommunicado." Notwithstanding this order, however, the FBI agents continued to visit and talk with both of them and a third defendant, Mrs. Behrens, every day except Sunday. During this period all three of them were allowed to read and discuss among themselves the unfavorable newspaper reports which their arrest and indictment had occasioned. They talked also with the FBI agents about this adverse publicity and about how they should plead to the charges.

September 25, one month and one day after Mrs. von Moltke's arrest, two lawyers came to the jail to see her. They had been sent by her husband. One of them appears to have taken the husband's language course at Wayne University. These lawyers' message was the first communication she had been permitted to receive from her husband since her removal to the county jail. She had been so well shut off from the outside world that she thought he did not even know where she was then confined. These lawyers informed her that, although they had come at her husband's request, they would not represent her as counsel. Furthermore, they warned her that they would not even hold what she said in confidence, and that they would feel free to disclose anything she told them to the Government. Only one of the lawyers appeared at the trial. He testified that the petitioner was concerned during their visit for her children and her husband, whom the university had removed from his $4,000 position the day after her arrest. She particularly inquired whether it would help her husband to get his university position back if she pleaded guilty, but received no counsel on the subject one way or another. In fact, the lawyers emphasized a number of times that they could not and would not advise her what she should do. Although they gave her a form of cross-examination regarding the charges against her in the indictment, they did not attempt to explain to her the implications of these charges, or to advise her as to any possible defenses to them, or to inform her of the permissible punishments under the indictment.

September 28, three days after the lawyers' visit, the petitioner and Mrs. Leonhardt were taken by FBI agents to the marshal's office where they talked with the assistant district attorney about what plea they should enter. Mrs. Leonhardt announced there that she would plead guilty, which plea she later entered, but the petitioner first

asked for the opportunity of discussing the matter with her husband. He came to the marshal's office, was allowed to talk with his wife in the "bull pen," and advised her not to do anything before she saw a lawyer. She then declined to plead guilty and was taken back to jail.

October 7, nine days later, she did plead guilty without having talked to any lawyer in the meantime except the FBI agent-attorneys, although she had seen her husband several more times. A few days before the 7th, Mrs. Behrens had entered a plea of guilty, and rumors reached the petitioner that other defendants named in the indictment would also plead guilty. During the interval between the 28th of September and petitioner's plea of guilty on the 7th of October, the FBI men had talked to her daily. She had particularly asked them whether under United States law she would have the right to a trial if all her co-defendants pleaded guilty. The agent's reply, as he remembered it, was "that the question of the trial would be up to the United States Attorney's Office." She also repeatedly plied the agents with questions as to what plea she should enter in order to reduce as much as possible the injurious publicity of the affair, and what would be the least harmful course to make it possible for her husband to recover his old position. She was also vitally interested in whether she would be deported, and whether, if she did plead guilty, her sentence could be served close to her family. All of these subjects the agents talked over with her in their daily conversations and one of them offered to, and did, discuss them with the assistant district attorney on her behalf. Following this discussion, the agent brought back word to the petitioner that the assistant district attorney could not control deportation, publicity, or the place of her imprisonment, but that if she pleaded guilty he would write a letter to the controlling authorities and recommend that she be imprisoned close to her family.

About this time one of the lawyer-agents of the FBI discussed the petitioner's legal problems with her at great length. According to his testimony he did his best to explain the implications of the indictment. She told this agent-attorney about a statement she had heard while in jail that unless she pleaded guilty her husband would be involved, and she asked the agent if this were true. He replied that he could not answer this question. She also asked one of the lawyer-agents whether mere association with people guilty of a crime—such association as that with which she was charged in the five overt acts—was sufficient in itself to bring about her conviction under the indictment. This agent, according to the petitioner, then explained the indictment to her by the use of a "Rum Runners" plot as an example. She testified that he said: "That if there is a group of people in a 'Rum' plan who violate the law, and another person is there and the person doesn't know the people who are planning the violation and doesn't know what is going on, but still it seemed after two years this plan is carried out, in the law the man who was present becomes . . . the person nevertheless is guilty of conspiracy. . . ." The FBI agent did not deny that he had given her the rum runner illustration. In fact, the agent said that it was quite possible that the conversation had occurred.[3]

During the ten days prior to her plea of guilty, petitioner had many conversations with FBI agents about how she should plead to the indictment. In resolving her doubts she had no legal counsel upon whom to rely

---

[3] "Q. And did you during that discussion use a [*sic*] illustration about a rum runner?

"A. Well, I heard Mrs. von Moltke say that, and since she did I have been trying to recall, and I cannot remember such an illustration.

"Q. I see.

"A. But it is quite possible that Mrs. von Moltke's memory is better than mine, and I may have used such an illustration."

except the government lawyer-agents, since neither she nor her husband could afford a lawyer, and the counsel promised by Judge Moinet never appeared. Her chief concern in trying to decide whether to plead guilty was not the indictment, or possible imprisonment; as was testified by government agents, "She was concerned about her husband and his job," and "she was hoping to do whatever would be best for her husband and her child." That her troubled state of mind was recognized by the prosecuting attorney is shown by these leading questions he asked her on cross-examination:

"Q. Now, isn't it true that up until the time you plead guilty you repeatedly asked the agents for advice as to whether you should plead guilty or not? Isn't that true?

"A. There was nobody else I could ask.

"Q. Well, just say yes or no.

"A. Yes."

October 7, having reached a temporary decision, she went with two of the agents to the assistant district attorney and told him that she wanted to plead guilty. Since Judge Moinet was not available, she was taken before another judge who was unfamiliar with the case. At first he would not accept the plea of guilty because she then had no lawyer, and the record before him indicated that she had previously pleaded not guilty under the advice of counsel. But in response to the judge's questions, she said that she understood the indictment and was voluntarily entering a plea of guilty. The judge then permitted petitioner to sign a written waiver of counsel. The whole matter appears to have been disposed of by routine questioning within five minutes during an interlude in another trial. If any explanation of the implications of the indictment or of the consequences of her plea was then mentioned by the judge, or by anyone in his presence, the record does not show it. Nor is there

anything to indicate she was informed that a sentence of death could be imposed under the charges. The judge appears not to have asked petitioner whether she was able to hire a lawyer, why she did not want one, or who had given her advice in connection with her plea. Apparently he was not informed that the petitioner's only legal counsel had come from FBI agents.

Petitioner continued thereafter to worry about whether she had acted wisely in changing her plea to guilty. On learning in January, 1944, from an FBI agent that she could request permission to withdraw the plea, she sent messages to the district attorney, seeking such permission. Some months later Judge Moinet appointed counsel solely for the purpose of filing a motion for leave to withdraw her plea. Counsel did file such a motion, but its dismissal as tardy [4] was required by the Criminal Ap-

---

[4] Rule II (4) of the Criminal Appeals Rules, effective September 1, 1934, then required such motions to be filed within ten days after entry of the plea and before imposition of sentence. *Swift* v. *United States*, 79 U. S. App. D. C. 387, 148 F. 2d 361; see *Hood* v. *United States*, 152 F. 2d 431, 435; *United States* v. *Achtner*, 144 F. 2d 49, 52. It has since been liberalized by Rule 32 (d) of the Federal Rules of Criminal Procedure, effective March 21, 1946.

Petitioner's brief states that the court denied her motion to withdraw the plea of guilty "without taking any testimony or permitting petitioner to take the stand . . . ." The Government has not challenged that statement. There is nothing in the record which indicates that the judge allowed any witnesses to testify on the motion. Nevertheless the judge, "after consideration of said motion and of the arguments presented," made purported findings of fact to the effect that she had pleaded guilty "after due and careful deliberation" and that at the time she entered the plea she "thoroughly understood the nature of the charge contained in the indictment." Neither the majority nor the minority opinion of the Circuit Court of Appeals referred to these so-called "findings" as a support for denial of the motion to withdraw the plea of guilty. The Circuit Court of Appeals simply justified the denial on the ground that the motion was filed "far too late."

peals Rules, even if the motion had been made when petitioner first learned of her rights. Had the motion to withdraw the plea of guilty not been tardy, the court would have been required to consider it in the light of what this Court declared in *Kercheval* v. *United States,* 274 U. S. 220, 223: "A plea of guilty differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction. . . . Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences." [5]

It is suggested that some adverse inference should be drawn against the petitioner because she failed to try to appeal from her conviction and sentence following the denial of her motion. In view of her counsel's appointment solely for "the purpose of moving that she be allowed to withdraw her plea" of guilty, it is questionable whether he had authority to prosecute an appeal from her conviction and sentence. At least the appointed counsel did not take an appeal and he was the only lawyer petitioner had. Furthermore, the futility of an appeal based

---

[5] On this same subject see Orfield, Criminal Procedure from Arrest to Appeal (1947) at 300: "Since a plea of guilty is a confession in open court and a waiver of trial, it has always been received with great caution. It is the duty of the court to see that the defendant thoroughly understands the situation and acts voluntarily before receiving it." See also 4 Blackstone, Commentaries at *329: "Upon a simple and plain confession, the court hath nothing to do but to award judgment; but it is usually very backward in receiving and recording such confession, out of tenderness to the life of the subject; and will generally advise the prisoner to retract it and plead to the indictment," and Bowyer, Commentaries on the Constitutional Law of England (1846) at 355: "The civil law will not allow a man to be convicted on his bare confession, not corroborated by evidence of his guilt, because there may be circumstances which may induce an innocent man to accuse himself."

upon the trial court's refusal to permit the withdrawal of her plea was obvious, in view of her failure to meet the strict requirements of Rule II (4). It seems pretty plain that the petitioner has raised the question here in the only proper way—by habeas corpus proceedings.

We accept the government's contention that the petitioner is an intelligent, mentally acute woman. It is not now necessary to determine whether, as the Government argues, the District Court might reasonably have rejected much of petitioner's testimony. Nor need we pass upon the government's contention that the evidence might have supported a finding that the FBI lawyer-agent did not actually give her the erroneous advice that mere association with criminal conspirators was sufficient in and of itself to make a person guilty of criminal conspiracy. For, assuming the correctness of the two latter contentions, we are of the opinion that the undisputed testimony previously summarized shows that when petitioner pleaded guilty, she did not have that full understanding and comprehension of her legal rights indispensable to a valid waiver of the assistance of counsel.

*First.* The Sixth Amendment guarantees that an accused, unable to hire a lawyer, shall be provided with the assistance of counsel for his defense in all criminal prosecutions in the federal courts. *Walker* v. *Johnston,* 312 U. S. 275, 286; see *Foster* v. *Illinois,* 332 U. S. 134, 136–137. This Court has been particularly solicitous to see that this right was carefully preserved where the accused was ignorant and uneducated, was kept under close surveillance, and was the object of widespread public hostility. *Powell* v. *Alabama,* 287 U. S. 45. The petitioner's case bristled with factors that made it all the more essential that, before accepting a waiver of her constitutional right to counsel, the court be satisfied that she fully comprehended her perilous position. We were waging total war with Germany. She had a Ger-

man name. She was a German. She had been a German countess. The war atmosphere was saturated at that time with a suspicion and fear of Germans. The indictment charged that while this country was at war with Germany and Japan the petitioner had conspired with others to betray our military secrets to Germany. She had been kept in close confinement since her arrest. Many of her alleged co-conspirators had already pleaded guilty. If found guilty, she could have been, and many people might think should have been, legally put to death as punishment for violation of the Espionage Act. If not executed, she could have been imprisoned for thirty years or for such shorter period as the judge in his discretion might fix. Even when the trial court was about to impose sentence on this petitioner following her plea of guilty, a lawyer might have rendered her invaluable aid in calling to the court's attention any mitigating circumstances that might have inclined him to fix a lighter penalty for her. Anyone charged with espionage in wartime under the statute in question would have sorely needed a lawyer; Mrs. von Moltke, in particular, desperately needed the best she could get.

*Second.* A waiver of the constitutional right to the assistance of counsel is of no less moment to an accused who must decide whether to plead guilty than to an accused who stands trial. See *Williams* v. *Kaiser,* 323 U. S. 471, 475. Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered. Determining whether an accused is guilty or innocent of the charges in a complex legal indictment is seldom a simple and easy task for a layman, even though acutely intelligent. Conspiracy charges frequently are of broad and confusing scope, and that is particularly true of conspiracies under the Espionage Act. See, *e. g., Gorin* v.

*United States,* 312 U. S. 19; *United States* v. *Heine,* 151 F. 2d 813. And especially misleading to a layman are the overt act allegations of a conspiracy. Such charges are often, as in this indictment, mere statements of past associations or conferences with other persons, which activities apparently are entirely harmless standing alone. A layman reading the overt act charges of this indictment might reasonably think that one could be convicted under the indictment simply because he had, in perfect innocence, associated with some criminal at the time and place alleged. The undisputed evidence in this case that petitioner was concerned about many of these legal questions—such as the significance of the overt act charges, and her possibilities of defense should all her co-defendants plead guilty—emphasizes her need for the aid of counsel at this stage.

*Third.* It is the solemn duty of a federal judge before whom a defendant appears without counsel to make a thorough inquiry and to take all steps necessary to insure the fullest protection of this constitutional right at every stage of the proceedings. *Johnson* v. *Zerbst,* 304 U. S. 458, 463; *Hawk* v. *Olson,* 326 U. S. 271, 278. This duty cannot be discharged as though it were a mere procedural formality. In *Powell* v. *Alabama,* 287 U. S. 45, the trial court, instead of appointing counsel particularly charged with the specific duty of representing the defendants, appointed the entire local bar. This Court treated such a cavalier designation of counsel as a mere gesture, and declined to recognize it as a compliance with the constitutional mandate relied on in that case. It is in this light that we view the appointment of counsel for petitioner when she was arraigned. This lawyer, apparently reluctant to accept the case at all, agreed to represent her only when promised by the judge that it would take only two or three minutes to perform his duty. And it seems to have taken no longer. Even

though we assume that this attorney did the very best he could under the circumstances, we cannot accept this designation of counsel by the trial court as anything more than token obedience to his constitutionally required duty to appoint counsel for petitioner. Arraignment is too important a step in a criminal proceeding to give such wholly inadequate representation to one charged with a crime. The hollow compliance with the mandate of the Constitution at a stage so important as arraignment might be enough in itself to convince one like petitioner, who previously had never set foot in an American courtroom, that a waiver of this right to counsel was no great loss—just another legalistic formality. We are unable to agree with the government's argument that the momentary appointment of the lawyer for arraignment purposes supports the contention that the petitioner intelligently waived her right to counsel. In fact, that court episode points in the other direction, for the judge then told the petitioner that he would appoint another lawyer "right away" for her—which he never did until long after she had pleaded guilty, too late to do her any good.

*Fourth.* We have said: "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." [6] To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel,[7] a judge must investigate as long and as thoroughly as the circumstances of the case before

[6] *Johnson* v. *Zerbst,* 304 U. S. 458, 465; see also *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 270.

[7] *Johnson* v. *Zerbst,* 304 U. S. 458, 464; *Glasser* v. *United States,* 315 U. S. 60, 70.

him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

This case graphically illustrates that a mere routine inquiry—the asking of several standard questions followed by the signing of a standard written waiver of counsel— may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel. And this case shows that such routine inquiries may be inadequate although the Constitution "does not require that under all circumstances counsel be forced upon a defendant." *Carter* v. *Illinois,* 329 U. S. 173, 174–175. For the record demonstrates that the petitioner welcomed legal aid from all possible sources; there would have been no necessity for forcing counsel on her.

Twice the court did designate counsel for petitioner. The first occasion was upon her arraignment. Petitioner appears willingly to have cooperated with this appointed counsel for the two or three minutes he was called upon to act. The second occasion was when counsel was named for the sole purpose of moving to withdraw her plea of guilty. Notwithstanding her unfortunate first encounter with court-appointed counsel and despite the fact that counsel was not designated the second time until it was obviously months too late to submit this

motion under the procedural rules, there is no complaint that the petitioner failed to cooperate with him. And the record is filled with evidence from many witnesses that the petitioner persistently sought legal advice from all of the very limited number of people she was permitted to see during the period of her close incarceration before her plea of guilty was entered. It is apparent from the record that when she did plead guilty the slightest deviation from the court's routine procedure would have revealed the petitioner's perplexity and doubt. For the testimony of all the witnesses points unerringly to the existence of the uncertainty which was obviously just below the surface of the petitioner's statements to the judge.

*Fifth.* The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. *Glasser* v. *United States,* 315 U. S. 60, 70. Before pleading guilty this petitioner undoubtedly received advice and counsel about the indictment against her, the legal questions involved in a trial under it, and many other matters concerning her case. This counsel came solely from government representatives, some of whom were lawyers. The record shows that these representatives were uniformly courteous to her, although there is no indication that they ever deviated in the slightest from the course dictated by their loyalty to the Government as its agents. In the course of her association with these agents, she appears to have developed a great confidence in them. Some of their evidence indicates a like confidence in her.[8]

The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be. Undivided allegiance and faithful, devoted service to a client are prized traditions of the Ameri-

---

[8] See note 3, *supra.*

can lawyer.[9]    It is this kind of service for which the Sixth Amendment makes provision.   And nowhere is this service deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is peculiarly abhorrent.

The admitted circumstances here cannot support a holding that petitioner intelligently and understandingly waived her right to counsel.   She was entitled to counsel other than that given her by Government agents.   She is still entitled to that counsel before her life or her liberty can be taken from her.

What has been said represents the views of MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE.   They would therefore reverse the judgment of the Circuit Court of Appeals, set aside the prior judgment of the District Court and direct that court to grant the petitioner's prayer for release from further imprisonment under the judgment based on her plea of guilty.   MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON, for the reasons stated in a separate opinion, agree that the judgment of the Circuit Court of Appeals

---

[9] American Bar Association, Canons of Professional and Judicial Ethics, Canon 15: "The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied.   No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty.   In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense."

Canon 4: "A lawyer assigned as counsel for an indigent prisoner ought not to ask to be excused for any trivial reason, and should always exert his best efforts in his behalf."

should be reversed, and that the District Court's prior judgment should be set aside, but they are of the opinion that, after setting aside its judgment, the District Court should further consider, and make explicit findings on, the questions of fact discussed in the separate opinion.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court is set aside. The cause is remanded to the District Court so that it may hold further hearings and give consideration to, and make explicit findings on, the questions of fact discussed in the separate opinion. If upon such further hearings and consideration the District Court finds that the petitioner did not competently, intelligently, and with full understanding of the implications, waive her constitutional right to counsel, an order should be entered directing that she be released from further custody under the judgment based on her plea.

*It is so ordered.*

Separate opinion of MR. JUSTICE FRANKFURTER, in which MR. JUSTICE JACKSON joins.

The appropriate disposition of this case turns for me on the truth of petitioner's allegation that she was advised by an F. B. I. agent, active in the case, that one who merely associated, however innocently, with persons who were parties to a criminal conspiracy was equally guilty.

We are dealing, no doubt, with a person of intellectual acuteness. But it would be very rare, indeed, even for an extremely intelligent layman to have the understanding necessary to decide what course was best calculated to serve her interests when charged with participation in a conspiracy. The too easy abuses to which a charge of conspiracy may be put have occasioned weighty animadversion by the Conference of Senior Circuit Judges. Re-

port of the Attorney General, 1925, pp. 5–6; and see also the observations of Judge Learned Hand in *United States* v. *Falcone,* 109 F. 2d 579, 581; affirmed in 311 U. S. 205. The subtleties of refined distinctions to which a charge of conspiracy may give rise are reflected in this Court's decisions. See, *e. g., Kotteakos* v. *United States, 328 U. S. 750.* Because of its complexity, the law of criminal conspiracy, as it has unfolded, is more difficult of comprehension by the laity than that which defines other types of crimes. Thus, as may have been true of petitioner, an accused might be found in the net of a conspiracy by reason of the relation of her acts to acts of others, the significance of which she may not have appreciated, and which may result from the application of criteria more delicate than those which determine guilt as to the usual substantive offenses. Accordingly, if an F. B. I. agent, acting as a member of the prosecution, gave her, however honestly, clearly erroneous legal advice [1] which might well have induced her to believe that she was guilty under the law as expounded to her by one who for her represented the Government, a person in the petitioner's situation might well have thought a defense futile and the mercy of the court her best hope. Such might have been her conclusion, however innocent she may have deemed herself to be. I could not regard a plea of guilty made under such circumstances, made without either the advice of counsel exclusively representing her or after a searching inquiry by the court into the under-

---

[1] This is the precise testimony: "That if there is a group of people in a 'Rum' plan who violate the law, and another person is there and the person doesn't know the people who are planning the violation and doesn't know what is going on, but still it seemed after two years this plan is carried out, in the law the man who was present becomes . . . the person nevertheless is guilty of conspiracy." The law, of course, is precisely to the contrary. *United States* v. *Falcone,* 311 U. S. 205, 210.

standing that lay behind it, as having been made on the necessary basis of informed, self-determined choice.

Of course an accused "in the exercise of a free and intelligent choice, and with the considered approval of the court . . . may . . . competently and intelligently waive" his right to the assistance of counsel guaranteed by the Sixth Amendment. *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 275; and see *Patton* v. *United States,* 281 U. S. 276, and *Johnson* v. *Zerbst,* 304 U. S. 458. There must be both the capacity to make an understanding choice and an absence of subverting factors so that the choice is clearly free and responsible. If the choice is beclouded, whether by duress or by misleading advice, however honestly offered by a member of the prosecution, a plea of guilty accepted without more than what this record discloses can hardly be called a refusal to put the inner feeling of innocence to the fair test of the law with intelligent awareness of consequences. Therefore, if the F. B. I. agent had admitted that the petitioner accurately stated his advice to her, or if the District Court upon a conflict of testimony had found that memory or truth lay with the petitioner, I could not escape the conclusion that the circumstances under which the petitioner's plea of guilty was accepted did not measure up to the safeguards heretofore enunciated by this Court for accepting a plea of guilty, especially where a sentence of death was at hazard.

On the record as we have it, however, I cannot tell whether the advice which, if given, would have colored the plea of guilty was actually given. If the unrevealing words of the cold record spoke to me with the clarity which they convey to four of my brethren, I should agree that the petitioner must be discharged. Conversely, if the District Court's opinion conveyed to me the findings which it radiates to my other brethren, I too would conclude that the judgment should be affirmed.

Unfortunately, the record does not give me a firm basis for judgment regarding the crucial issue of the F. B. I. agent's advice to the petitioner. It is not disputed that the agent, who was also a lawyer, did talk with her and did discuss legal issues with her. But he neither admitted nor denied whether, in the course of his discussions with her, he expounded the law so as hardly to leave her escape, however innocent under a correct view of the law she may have been. He did not even suggest that even though he did not remember, he was confident that he could not have given her the kind of misleading legal information she attributed to him. On the contrary, he added that "it is quite possible that Mrs. von Moltke's memory is better than mine." [2] From the dead page, in connection with the rest of the agent's testimony, this suggests a scrupulous witness. But I cannot now recreate his tone of voice or the gloss that personality puts upon speech. Therefore I am unable to determine whether the petitioner pleaded guilty in reliance on the palpably erroneous advice of an F. B. I. lawyer-agent who, as the symbol of the prosecution, owed it to an accused in petitioner's position to give her accurate guidance, if he gave any.

Nor does the District Judge's opinion resolve these difficulties for me. From what he wrote it would be the most tenuous guessing whether he rejected the petitioner's account of the F. B. I. agent's counselling or whether he did not attach to that issue the legal significance which

---

[2] "Q. And did you [the F. B. I. agent] during that discussion use a [sic] illustration about a rum runner?

"A. Well, I heard Mrs. von Moltke say that, and since she did I have been trying to recall, and I cannot remember such an illustration.

"Q. I see.

"A. But it is quite possible that Mrs. von Moltke's memory is better than mine, and I may have used such an illustration."

I deem controlling.[3]   Since the record affords neither resolving evidence nor the District Court's finding on what I deem to be the circumstance of controlling importance, I would send the cause back to the District Court for further proceedings with a view to a specific finding of fact regarding the conversation between petitioner and the F. B. I. agent, with as close a recreation of the incident as is now possible.

MR. JUSTICE BURTON, with whom THE CHIEF JUSTICE and MR. JUSTICE REED concur, dissenting.

As the issues in this case are factual and deal largely with the credibility of witnesses, the binding force of this decision as a precedent is narrow.   However, to guard against undue extension of its influence, a recorded dissent seems justified.

The Government does not contest the release of the petitioner if she establishes, as a matter of fact, that either her long considered and unequivocal plea of guilty

---

[3] The District Judge indicated abandonment of the charges that the "agents of the Federal Bureau of Investigation mislead [*sic*] her or made promises to her that, which at least [in] some degree, influenced her action in pleading guilty to the charge," but "for the purpose of the record" he stated "most vigorously that there was absolutely nothing in the testimony sustaining such charges or implications."   While it does appear, from the record, that petitioner abandoned her charge of coercion, there is nothing to buttress the suggestion that she abandoned the charge that she had been misled by the agent, and I therefore read the statement as referring to threats or promises to induce confession by the petitioner.   The District Judge gave no intimation whatever that in his view the plea of guilty in connection with all the other circumstances could not be deemed to have been intelligently tendered, if in fact it was influenced by the F. B. I. agent's exposition of the law, as asserted by the petitioner.   Nowhere is there a suggestion that although the agent was not prepared to say her memory of the interview was false or incorrect, the District Judge rejected her account.

in the original proceedings against her for violation of the Espionage Act or her written and otherwise clearly stated waiver of counsel in those proceedings was not freely, intelligently and knowingly made. The Government vigorously contends that she has failed in this proceeding to establish either of those facts. We agree with the Government. She has failed to do so and, having so failed, she is not entitled to release. The printed record does not require reversal of the judgment. The uniform findings of fact against her by the three trial judges who separately saw and heard her are amply sustainable.

The petitioner made her plea of guilty and filed her waiver of counsel in open court before District Judge Arthur F. Lederle on October 7, 1943. In November, 1944, after consideration and denial of her motion for leave to withdraw her plea of guilty, she was sentenced by District Judge Edward J. Moinet. She has made no direct attack on the judgment against her. Accordingly, before considering the exceptional burden of proof which she must bear in making a collateral attack upon that judgment more than a year after it was entered, it is well to examine the process of law which led up to this judgment.

At her arraignment, September 21, 1943, before District Judge Edward J. Moinet, she was assigned counsel to assist her during the arraignment. Such counsel advised her to stand mute. She did so. This conduct preserved her full rights and it has not prejudiced her position. A plea of not guilty was entered for her. This left her free to stand by it or to change it to a plea of guilty as she later did. There is no indication that other counsel could have done more for her than was done. She thus was made aware that the court would assign counsel to assist her. In fact she testified that, after the arraignment, "Judge Moinet said he would appoint an

attorney right away, and I understood that the gentleman was to be expected to come right away." This referred to the period after her arraignment.

In addition to this contact with the attitude of the court on the subject of counsel, she frequently discussed the subject of counsel with her husband. He himself had some legal education. She also talked with two lawyer friends of her husband who came to see her as friends, although not professionally. She likewise discussed her situation on many occasions with the representatives of the Federal Bureau of Investigation and occasionally with representatives of the United States Attorney. She repeatedly was urged by her husband not to do anything until she had consulted with an attorney. On the basis of this advice, she decided not to plead guilty on September 28, although several other defendants in the same proceeding had done so. She testified as follows about her husband's advice and about her decision of September 28:

"Q. He told you to get a lawyer?

"A. Yes; he said I should not [plead guilty] before I have seen an attorney; on such a question I should talk to an attorney first about the whole thing.

.    .    .    .    .

"A. My husband said to wait until a lawyer comes out.

"Q. And you decided not to plead guilty because of that?

"A. Because of that, yes."

Several days later she finally determined to plead guilty. On October 7, 1943, she expressly waived counsel, both in open court and in writing. As to this she later was asked on the stand:

"Q. So, during the week you decided to disregard the advice that your husband had given you?

"A. Yes, sir.

.        .        .        .        .

"Q. You made that decision; yes or no?

"A. Yes."

In other words, she had discussed her situation to her own satisfaction to the point where she had reached a conclusion both as to her plea of guilty and as to her wish to waive counsel. There is no constitutional provision that required or permitted counsel to be thrust upon her against her wishes. She had a right to decide that she did not want to discuss her case further with anyone. The issue was not then and is not now whether she might have been benefited by having counsel. She was an "intelligent, mentally acute woman" and, for reasons of her own, she made up her mind that she wished to plead guilty and to waive counsel. If she did this freely, intelligently and knowingly, that was her right and that action should be final, subject only to a motion to withdraw her plea in regular course by due process of law or to appeal from the judgment rendered on her plea. Under the rules of the court, any withdrawal of her plea had to be made within ten days after entry of such plea and before sentence was imposed. Rules for Criminal Appeals, Rule II (4), 292 U. S. 662. This was not done. Judge Lederle, to guard against any misunderstanding, on October 7, 1943, specially inquired if she desired the assistance of counsel. She answered in the negative. He then inquired as to what her plea was. She answered guilty. In addition, she submitted a written waiver of counsel. The court then deferred sentence and referred the case to the United States Probation Officer for investigation and report. Ample time was taken for this.

In June, 1944, she was taken before Judge Moinet before whom she originally had been arraigned. She then advised him that she wished to change her plea. The judge informed her that she was entitled to representation by counsel and that an attorney ought to make a motion for permission to withdraw her plea and that, if she had a preference as to counsel, he would appoint such counsel as she desired him to appoint. The matter was left in abeyance while she tried to select counsel. On July 3, 1944, she wrote to Judge Moinet, advising him that she had no preference and the court soon thereafter appointed counsel for the purpose of making her motion. The assistance rendered by such counsel is not criticized. He secured from Judge Moinet not merely a ruling upon the procedural point as to the untimeliness of her motion, but also specific findings bearing upon its merits. This order made by Judge Moinet, about a year after her arraignment before him, is significant because of its direct relation to the issue now before the Court. His order read as follows:

"This cause having come on for hearing upon the motion of the defendant Grafin Marianna von Moltke for leave to withdraw her plea of guilty, heretofore entered, and for leave to enter a plea of Not Guilty to the indictment filed herein, the matter after hearing, having been submitted, the Court, after consideration of said motion and of the arguments presented on behalf of the respective parties hereto, specifically finds:

"1. That the defendant Grafin Marianna von Moltke was properly advised of her constitutional rights by the Court, both prior to and at the time she entered her plea of Guilty to the indictment;

"2. That the plea of Guilty, entered several weeks after the filing of the indictment and her arraign-

ment thereon, was submitted after due and careful deliberation;

"3. That the defendant was advised of and thoroughly understood the nature of the charge contained in the indictment filed in this cause;

"4. That no promises or inducements or threats were made for the purpose of obtaining the plea of Guilty, and that the entry of the plea of Guilty was not due to any misrepresentations;

"5. That the motion praying for leave to withdraw the plea of Guilty was not filed within the period fixed by Rule II (4) adopted by the Supreme Court of the United States of America;

"Wherefore, It Is Ordered that the said motion to withdraw the plea of guilty entered by the defendant Graffin [Grafin] Marianna von Moltke in the above entitled cause, be and the same is hereby denied."

This was in November, 1944. Judge Moinet asked the defendant whether she had anything to say why judgment should not be pronounced against her, and, no sufficient reason to the contrary being shown or appearing to the judge, he sentenced her to imprisonment for four years. She began serving her sentence. However, after a determination had been made by the Government in 1945, looking toward her removal and repatriation to Germany, she, in 1946, filed a petition for *habeas corpus* making the present collateral attack on the original proceedings. We, therefore, are asked to review here the factual findings of the District Court made in April, 1946, through District Judge Ernest A. O'Brien in this *habeas corpus* proceeding and, by way of collateral attack, to review the action of the same District Court, taken in the original proceeding through Judge Lederle in October, 1943, and through Judge Moinet in November, 1944. While such proceedings by *habeas corpus,* based on constitutional grounds, are vital to the preservation of individual rights,

the protection of our judicial process against the making, in this way, of unjustified attacks upon such process is equally important to the preservation of the rights of the people as a whole. Each attempted attack calls for the careful weighing not only of the claims made, but also of the proof submitted to sustain each claim.

In now attacking collaterally the unappealed and deliberate judicial proceedings of 1944, a heavy burden of proof rests upon the petitioner to establish the invalidity of her original plea and waiver. The essential presumption of regularity which attaches to judicial proceedings is not lightly to be rebutted. *Johnson* v. *Zerbst,* 304 U. S. 458, 468–469; *Hawk* v. *Olson,* 326 U. S. 271, 279. Judge O'Brien recognized the strength of this presumption and the heavy burden of proof to be borne by the petitioner. He therefore held extended hearings at which the petitioner and many others appeared as witnesses. The evidence included a substantial showing that the trial judge in accepting the petitioner's plea of guilty in the original proceeding had done so only after satisfying himself, by careful questioning, that the plea was not the result of threats or promises and that, with knowledge of her right to counsel, the petitioner had voluntarily waived that right.[1] At the conclusion of these hearings Judge O'Brien found not only that the petitioner had failed to sustain the burden resting upon her, but that the overwhelming weight of the evidence in these proceedings was against her.

His statement as the trial judge in the *habeas corpus* proceedings is impressive and entitled to great weight here:

"In the petition filed in this cause the petitioner directly or by implication charges that the District

---

[1] See *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 276–277.

Attorney having the case in charge and agents of the Federal Bureau of Investigation mislead [misled] her or made promises to her that which at least [in] some degree, influenced her action in pleading guilty to the charge. I am of the opinion that these charges have now been abandoned by the petitioner but for the purposes of the record I wish to state most vigorously that there was absolutely nothing in the testimony sustaining such charges or implications. The conduct of both the officials of the District Attorney's office and the agents of the Federal Bureau of Investigation were meticulous in safeguarding the rights of the petitioner and that the record is utterly bare of any support of petitioner's contentions.

"The petitioner is a woman obviously of good education and above the average in intelligence. Her knowledge of English was fluent and ample. She had discussed the case with various people before the plea of guilty was entered. In fact, at her own request, she had a conference with the chief assistant district attorney wherein she endeavored to secure from him some promises of leniency and convenience as an inducement to a plea of guilty. These advancements by the petitioner were, of course, repudiated by the district attorney and she was informed of the officials who had jurisdiction over the matter in advent [the event] of her plea of guilty.

"The chief contention of the petitioner was that her waiver of her right to counsel was not competently and intelligently made. The plea was taken before Judge Arthur Lederle of this District. The evidence showed that the Judge inquired of her if she understood the charges made in the indictment. She answered in the affirmative. The Judge inquired if she desired the assistance of counsel. She answered in

the negative. The Judge then inquired what was her plea. She answered guilty. In addition to this she submitted a signed waiver stating that she did not desire counsel.

. . . . .

"The only substantial question in this case is whether the petitioner intelligently and knowingly waived her constitutional rights. It was her obligation to sustain the allegations of her petition by a preponderance of evidence. Not only has she failed in this, but I believe that the evidence is overwhelming against her contentions. The petitioner is an intelligent, mentally acute woman. She understood the charge and the proceedings. She freely, intelligently and knowingly waived her constitutional rights. I conclude, therefore, that there is no merit in her petition and that it shall be dismissed together with the writ." [72 F. Supp. 994, 995, 997.]

The Circuit Court of Appeals affirmed the judgment dismissing the petition for the writ of *habeas corpus*. That judgment is now brought here and we are called upon to make a further review of the factual conclusions of the District Court in the *habeas corpus* proceedings.

Due process of law calls for an equal regard by us for the interests of the Government and of the petitioner in seeking the nearest possible approximation to the truth. Necessarily we have only the printed record here. On the other hand, the trial judge, faced by the same issues, heard spoken the words we now read. He saw the original instruments that we now see reproduced. He observed the conduct and expressions of the petitioner and of the other witnesses whereas we cannot make an informed independent conjecture as to such conduct or expressions. From the living record he found the factual issues overwhelmingly against the petitioner.

There is nothing in the printed record sufficient to convince us that, if we had seen the witnesses and heard the testimony, we would not have reached the same conclusion.  Much less is there anything in it that convinces us that, not having seen or heard it made, we are justified in reversing his findings which were based upon more than can be before us.  Under the circumstances, we believe that the truth is more nearly approximated and justice is more surely served by reading the printed record in the strong light of the trial judge's factual conclusions than by attempting to interpret that record without giving large effect to his conclusions as to its credibility and to the inferences he has drawn from it.  The aid to the ascertainment of the truth to be derived from the trial court's impartial observation of the witnesses should not be dissipated in the process of review.  His appraisal of the living record is entitled to proportionately more. rather than less, reliance the further the reviewing court is removed from the scene of the trial.  See *District of Columbia* v. *Pace,* 320 U. S. 698, 701; *United States* v. *Johnson,* 319 U. S. 503, 518; *Williams Mfg. Co.* v. *United Shoe Machinery Corp.,* 316 U. S. 364, 367; *Delaney* v. *United States,* 263 U. S. 586, 589–590.

Her status as an enemy alien does not, in itself, affect her right to counsel or the informed character of her plea of guilty and her waiver of counsel.  The fact that the charge against her was under the Espionage Act and therefore carried a technical possibility of the death penalty did not at any time introduce a practical consideration that she was in actual danger of suffering capital punishment. She accurately forecast the general character of her sentence and was concerned primarily with the wish that her sentence be served near her family.  An assistant district attorney stated that he would write a letter recommending that she be imprisoned close to her family.

While a conspiracy is exceptionally difficult to define in all its legal and factual complexities, there is nothing in the Constitution that prevents an accused from freely, intelligently and knowingly choosing to plead guilty to that, as well as to other complex charges, for reasons best known to the accused, as an alternative to standing trial on that charge. This was her right. Having thus positively decided not to stand trial she did not require counsel in order freely, intelligently and knowingly to waive counsel.

Our Constitution, Bill of Rights and fundamental principles of government call for careful and sympathetic observance of the due process of law that is guaranteed to all accused persons, including enemy aliens like the petitioner. The Constitution, however, was adopted also in order to establish justice, insure domestic tranquility, promote the general welfare and secure the blessings of liberty to the people of the United States as a whole. To that end, it is equally important to review with sympathetic understanding the judicial process as constitutionally administered by our courts. While the majority of this Court are not ready to affirm the judgment below on the record as it stands, their decision to remand the case for further findings does not mean that established and salutary general presumptions in favor of the validity of judicial proceedings and in favor of a trial court's conclusions as to the credibility of witnesses are to be relaxed.