**UNITED STATES of America, Plaintiff,**

v.

**Nelson Orman KING, alias James Frederick Kelly, Defendant.**

**Cr. No. 5036.**

United States District Court, D. Wyoming.

Feb. 4, 1955.

John F. Raper, Jr., U. S. Atty., and Clifford N. Bloomfield, Jr., Asst. U. S. Atty., of Cheyenne, Wyo., for plaintiff.

Ellen Crowley of Cheyenne, Wyo., for defendant.

KENNEDY, District Judge.

The above entitled cause is before the Court upon the allowance of what has been designated as a Writ of Error Coram Nobis.

Although it may be somewhat extended it would seem necessary to preface the decision of the Court upon a review of the facts and circumstances preceding the hearing which was had on January 31, 1955. In the first instance, the defendant applied for relief under 28 U.S. C. § 2255 and it appearing to the Court that the defendant had served the term for which he had been sentenced in this court that there was no relief which could be granted and therefore the relief sought under the original petition and the delayed motion to vacate judgment and sentence were denied. Subsequently after a considerable amount of correspondence and the filing of various petitions the defendant filed what he denominated a Petition for Writ of Error and Ancillary Writ of Certiorari. In the meantime the Supreme Court of the United States on January 4, 1954, in the case of United States v. Morgan, 346

U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248, handed down a decision to the effect that the Federal Rules of Criminal Procedure, 18 U.S.C.A., did not abolish the ancient Writ of Error Coram Nobis, which was still available to a defendant in an attempt to show that his former conviction was invalid regardless of the time at which it might be invoked. This decision was rendered by an almost equally divided court. Nevertheless it became the law of the land and this Court following the broad principles therein laid down entered an order allowing the application of the defendant to be considered as constituting a Writ of Error Coram Nobis and as such to be prosecuted and giving the government plaintiff time in which to answer or otherwise plead. Subsequently the Court entered an order giving the defendant time within which to file specifications of error and fixing the time within which the government should answer or otherwise plead to the same. Within the time fixed specifications of error were filed by the counsel for defendant which in substance contended that the defendant did not competently and intelligently waive his right to counsel and that the proceedings before the Court at the time of sentence were irregular and invalid upon the ground that he was insane at the time of sentence and therefore incompetent to waive his right to counsel and to defend himself. The government answered the specifications of error in the form of a general denial and that the defendant had been guilty of laches, which should in equity be a bar to maintaining the proceeding.

In this situation the matter came on for hearing before the Court with representation as above indicated. Previous to this there was filed a stipulation signed by the attorney for the plaintiff and the attorney for the defendant and also by the defendant himself expressly waiving his right to be confronted by the plaintiff's witnesses, which obviously eliminated the necessity of bringing the defendant before the Court for the hearing. This was undoubtedly a wise and effective manner of saving the trouble and expense of bringing the defendant before the Court inasmuch as he depended upon the element of insanity at the time the sentence was passed, he could not logically testify in his own behalf at the hearing. In addition, this being a civil proceeding, the presence of the defendant probably was not necessary. The Court-appointed counsel has in the opinion of the Court exercised great energy, perserverance and patience in the preparation and trial of the rather complicated proceeding.

It was further stipulated at the beginning of the hearing that the procedure which took place at the time of sentence so far as the Court's remarks were concerned were the same as shown in the case of Cherrie v. United States, 10 Cir., 179 F.2d 94, 95, in which the Court said to the defendant:

> " 'The Court: Are you ready to plead to this information of which I have heretofore outlined in regard to the charge against you without the assistance of counsel to which you are entitled? A. Yes, sir.' "

In this decision on appeal it was held that the statement of the Court did not fully discharge its duty in the matter of advising the defendant as to his rights to have the benefit of counsel. The case was accordingly reversed and a hearing ordered on defendant's motion.

The Court thereupon proceeded to give the defendant in that case a hearing and the decision of the Court was that upon all the evidence the defendant had competently and intelligently waived his right to counsel. This decision was likewise appealed and in Cherrie v. United States, 10 Cir., 184 F.2d 384, the Court held that upon the subsequent record of the hearing the defendant had competently and intelligently waived his constitutional right to counsel. This case and its outcome is mentioned somewhat in detail owing to the fact that it appears in the stipulation as to what the facts were concerning the remarks of the Court as in the case at bar and the

facts involved in the ultimate results. It would appear from the opinions in these cases that principal stress is laid upon the circumstance that the Court did not advise the defendant that his right to counsel was guaranteed by the Constitution of the United States. Although it is mentioned in a quotation from a Supreme Court opinion that in Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309, the Court in advising a defendant might be required to state additional things which might make the obligations of the Court somewhat difficult in fulfillment. The difference in individual cases, however, may make a difference therein in treatment. However, the hearing in the case at bar followed substantially the steps taken in the Cherrie case after its first reversal.

The sentence in the case at bar was based upon an indictment charging the defendant in five counts with impersonating a United States Officer, all of which were alleged to have occurred in the city of Sheridan, State of Wyoming, from the latter part of August 1944 up to and including the 17th day of October 1944. On the 27th day of November 1944 the defendant was brought before the Court, waived an indictment, waived the right to counsel and was sentenced to a term of three years on each count, to be served concurrently and not consecutively. Thereafter he was delivered to the United States Penitentiary at Leavenworth, Kansas, on December 7, 1944, and there incarcerated until his term of imprisonment expired some time in 1947. The record shows that at this time the defendant was twenty-six years old and had reached the eighth grade in education. The defendant had several aliases, one of which was "James Frederick Kelly", under which name he was originally apprehended in the case at bar. He had originally been prosecuted before the charge here involved for unlawful use of firearms, violation of the Dyer Act, 18 U.S.C.A. § 2311 et seq., robbery not armed, and robbery armed, upon which latter charge he was prosecuted and convicted in the state of Michigan in 1936.

While incarcerated upon sentence under this charge he escaped on June 15, 1944, and was apprehended in the city of Sheridan, as before mentioned. A hold order was placed against him by the Michigan authorities and which undoubtedly resulted after his serving the term of sentence by this Court in his being returned by the Michigan authorities and thereafter prosecuted upon a kidnapping and prison escape charge, which trial took place in Michigan in 1953 and upon which he received the sentence which he is now serving of twenty-five years in the Michigan institution. The record further shows that at the trial in Michigan his counsel served notice (presumably under a requirement of the law) that he intended to advance the defense of insanity, which defense was therefore before the Court and regardless of which the verdict of the jury was one of guilty.

After his admission to the Leavenworth penitentiary on December 7, 1944, defendant was given the ordinary preliminary examinations before being classified and thereafter on January 4, 1945, he was given treatment for pain, headaches and a claimed backache. He was given an IQ test and registered 118. Later, and beginning on about January 8, 1945, to February, he seemed to be suffering from a depression brought on chiefly, according to the testimony of the psychiatrist, by the long term of imprisonment confronting him which seemed to give an indication of suicidal intent, for which treatment was continued and he was classified as suffering from what was commonly known then as "prison psychosis". Subsequently and sometime in the forepart of March 1945 he was sent to the Springfield Medical Center for further treatment.

In support of the defendant's contentions, his complete record at the Federal institution was offered in evidence without objection, which showed somewhat in detail his treatment during his incarceration in the institution and included his various treatments for his so-called mental condition. The government then

called the psychiatrist who was connected with the Federal institution at the time of plaintiff's incarceration in the person of Dr. Manley B. Root, who explained in detail his observation of the defendant and his reactions as to his mental condition. Not only did the doctor rely upon the record concerning the defendant but remembered him personally and was therefore able to testify as to his personal opinion in connection with the individual record of the defendant. The doctor gave his impressions, which were at times punctuated with technical medical terms but from his statements in their entirety incorporating his opinion it was to the effect that the defendant subsequently developed into what is known as a "psychotic" based upon his apprehension of his fear of long imprisonment and that at the time he was received at the institution he was not a psychotic when first admitted. The substance of his testimony likewise was to the effect that while he could be diagnosed as a psychotic in a certain classification he was not thereby deprived of knowing what was going on around him or failure to recognize his situation in the matter of making decisions; that he knew the difference between right and wrong (which some courts have held is not the all conclusive test of insanity) and that in the opinion of this specialist he was fully capable of realizing his situation at the time of sentence and before, so as to fully comprehend the matter of waiving the appointment of counsel for his defense. The doctor characterized the defendant as a "pathological liar" but this did not affect the doctor's conclusions as many people whose sanity is never questioned are entitled to this classification. Little good could come from a further analysis of this witness' testimony than to state its general trend with his conclusions and opinion.

In addition, the government offered testimony concerning the conditions surrounding the apprehension of the defendant and his process through the court, including the sentence. Alger W. Lonabaugh of Sheridan, Wyoming, testified he was the United States Commissioner before whom the defendant was brought shortly after his apprehension. While the witness did not specifically remember the defendant personally yet having been a commissioner for several years before this event he had always indulged the practice of informing the defendant of his rights; that he was entitled to a preliminary hearing; that he might have the benefit of counsel but it would have to be secured through the Court as he had no authority to appoint counsel; that according to the record the defendant did not ask for a preliminary hearing and that thereafter he was bound over under bond to the United States Court. The defendant was thereupon transported to Cheyenne and confined in the Laramie County Jail up to the time of his sentence. The testimony of the undersheriff and the jailer was presented, which was to the effect that they noticed nothing abnormal as to his sanity about the defendant; that while so incarcerated in the county jail he, with one other, escaped by assaulting the jailer and through the use of a phony gun which the defendant had manufactured while in jail and that he was shortly thereafter apprehended and placed back in custody until his arraignment in court. Honorable John C. Pickett, Assistant United States Attorney at the time the defendant was arraigned (now a Judge of the Tenth Circuit Court of Appeals), also testified. The substance of Judge Pickett's testimony was to the effect that he did not personally remember this particular defendant as among the many others who were presented for arraignment, yet it was the universal custom of his office to advise defendants in advance of arraignment that they would have the right to the selection of counsel of their own choice if they had money to pay or by the appointment of the Court if they had no funds with which to employ counsel and that it was his best judgment that the universal custom had been employed in the case of the defendant. George G. Smith, a Deputy United States Marshal, testified

that he made the arrest of the defendant by serving the warrant upon him at Sheridan and later brought him to Cheyenne and noticed nothing unusual about the man as to his mental reactions. Smith testified of having experience as a law enforcement officer for about twenty-one years before the arrest made in the instant case and therefore necessarily coming in contact with a great diversity of defendants in criminal cases. While the Judge himself cannot or did not testify, and yet it might logically be taken into consideration that if it had appeared that a defendant was other than apparently normal mentally at the time of arraignment and sentence he would either have appointed counsel on his own motion or required the defendant to be subjected to some mental test, which practice is sometimes indulged.

Coming back then to the analysis of the record it may be observed that our Circuit has passed upon a variety of instances in which the circumstance of a possible abnormal condition of the mind of the defendant has been involved. The courts have not evidently followed a uniform course in their disposition of cases of this character. It was held in Frame v. Hudspeth, 10 Cir., 109 F.2d 356, at page 358, as follows:

"Where one is charged with the commission of an offense and is tried therefor, there is a presumption that the proceedings were regular and in conformity with law. (Cases cited.) Also, it is presumed that the accused is sane. The presumption of sanity continues until overcome by evidence. (Cases cited.)

"When, however, it is once established that a person has been legally adjudged mentally incompetent, the presumption of sanity no longer prevails; in its place there arises a presumption of lack of mental capacity, and the burden of proving mental capacity devolves upon him who asserts it. (Cases cited.)"

It would seem that under this statement the presumptions which are said here to exist prevail and therefore must be overcome by substantial evidence. In the case at bar there is no evidence which indicates that the defendant's sanity had ever been questioned before the sentence was passed. In other cited cases even though the mental condition of the defendant has been presented to the Court yet it was not sufficient to overturn the judgment of the trial court in sustaining the plea and sentence. Such a case is Brewer v. Hunter, 10 Cir., 163 F.2d 341. Many cases might be cited which reveal a variety of circumstances under which the mental condition of a defendant may be brought up for examination in order to affect the sentence of a trial court but in the case at bar we have a situation in which there is no evidence of pre-existing mental derangement brought to the attention of the Court or the authorities so as to create even a suspicion of insanity or mental derangement and nothing of this character is brought out until some time after he had been confined in the Federal institution upon the sentence imposed. His prior record indicates that he was of a keen mind; that such record was spotted with many violations indicating that he was at least "learned in the law" so far as violating it is concerned, from which it is rather presumptious to draw a conclusion that he did not know what he was doing at the time sentence was passed. Coupled with this, of course, is the thought that whatever is done with this sentence can have no effect upon the sentence he is now serving in the state of Michigan, except that its nullification might be taken into consideration should an appeal be made for parole.

Under all the foregoing circumstances this Court feels that it would not be justified in nullifying the sentence imposed by this Court and accordingly an order will be entered overruling and denying the petition to set aside the sentence under this Coram Nobis proceeding and sustaining such sentence of November 27, 1944, which order and judgment may be submitted by counsel for plaintiff on or before February 10, 1955.