UNITED STATES, Appellant

v

LEO I. HOWELL, Specialist Four (E-4), U. S. Army, Appellee

11 USCMA 712, 29 CMR 528

No. 13,969

Decided July 29, 1960

Lieutenant Colonel James G. McConaughy argued the cause for Appellant, United States. With him on the brief was First Lieutenant George J. Miller.

First Lieutenant Robert B. Gillan argued the cause for Appellee, Accused. With him on the brief were Lieutenant Colonel W. H. Blackmarr and First Lieutenant Robert D. Stiles.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

In the instant case a board of review placed too great a burden on the Government to protect an accused who was intent on forcing a law officer into the inextricable position of either granting a continuance or committing an error by conducting a trial while accused was without the benefit of counsel. Obviously a system of justice would indeed be weak and ineffective if it could be manipulated to the advantage of cunning or recalcitrant persons on trial, and we do not propose to undermine the law by permitting this accused to reject without reason or excuse one of the beneficent legal privileges accorded him by the Uniform Code of Military Justice and then complain because he lost.

This appeal concerns the second conviction of the accused for committing the alleged offenses as he was first found guilty by a general court-martial sitting in Germany on April 14 to 16, 1959. On that occasion he was convicted of making a false official statement, making a false claim, and bigamy, in violation of Articles 107, 132 and 134, Uniform Code of Military Justice, 10 USC §§ 907, 932, 934, respectively. He was sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for five years, and reduction to the lowest enlisted grade. Subsequently, the convening authority disapproved the findings and ordered a rehearing because of trial counsel's improper cross-examination of the accused when he was a witness in his own behalf. The identical charges came on for rehearing, and, finally, after the events recounted later in this opinion, accused was again found guilty of all offenses charged. The same punishment was assessed by the court, and the convening authority approved except he reduced the period of confinement from five to four years.

In due course of time, the record reached the board of review, and that tribunal disapproved the findings and sentence, holding that the accused was deprived of his right to representation of counsel guaranteed him by Article 38(b), Uniform Code of Military Justice, 10 USC § 838. In so concluding, the board recognized that in United States v Kraskouskas, 9 USCMA 607, 26 CMR 387, this Court had observed that an accused could waive his right to counsel. However, the board found that the doctrine of waiver was inapplicable in this case because it concluded the law officer failed to make the intensive and comprehensive inquiry required by Federal court decisions that had considered the waiver of rights guaranteed by the Sixth Amendment to the Constitution of the United States. The Judge Advocate General of the Army thereafter certified the record to this Court requesting that we make the following determination:

"Was the board of review correct in holding that the accused was unlawfully deprived of the right to counsel?"

In order to frame the issue in a satisfactory manner, it is necessary to state a few additional facts. At the rehearing, accused was defended by the same appointed defense counsel who represented him at the first trial. In addition, he had retained the services of individual civilian counsel, a member of the Massachusetts Bar and a former United States Attorney in Germany. On the 20th day of July 1959, when the rehearing commenced, an out-of-court hearing was held to entertain certain defense motions. The individually retained defense counsel sought to delay the trial, and in support of his position asserted that his preparation of the defense was hindered by the fact that accused was kept in confinement from his original conviction until the rehearing. Counsel, however, conceded that he had not been denied consultation with the accused, and the weakness of this ground became apparent. He then went on to state that accused was willing to testify under oath that there was evidence in the United States material to the defense which accused alone could obtain, but significantly

counsel did not know the character of this evidence. To support the statement of his counsel, accused then took the witness stand and testified substantially as follows: That he had attempted to secure the desired evidence prior to the first trial; that his mother was the only conduit through which possession would be obtained; that due to the fact he was found guilty at the first trial, she was not expediting its acquisition; that she was waiting until accused was transported to the United States or was informed by him that he needed the documents; that the evidence consisted of an affidavit signed by his alleged wife and three other affidavits signed by people "connected with the law"; and that his mother's lawyer was waiting to find out how much time he had to secure these affidavits.

From other testimony, it appeared that both civilian and military defense counsel were kept completely uninformed by the accused as to the nature of the evidence that was to be involved in the alleged affidavits, although shortly after the original trial appointed defense counsel had written to accused's mother but had received no answer. This, according to the accused, was because his mother was a suspicious woman who would trust no one but himself, and she would respond only to his plea.

As a result of this out-of-court hearing, a sixty-day continuance was granted by the law officer so the accused could obtain the evidence and individual counsel could prepare his defense. To further aid the accused, the law officer ordered trial counsel to make sure he was not hindered in his attempt to secure any evidence necessary for his defense. The trial was to proceed on September 21, 1959, but on September 14, 1959, the defense asserted the document had not arrived and requested a further delay. This request was granted and October 1, 1959, was ordered as the date of trial. The law officer expressed some reservations about this additional delay but both counsel assured him at this time that they would be ready for trial on the selected date.

Apparently the assurance was too optimistic, for there was another two weeks' continuance.

Ultimately, the court was called to order on October 14, 1959, but in spite of the prior assurances and the consideration previously shown accused, the defense moved for another continuance, alleging that accused was still awaiting news from his mother. The defense supported the motion by presenting a letter from accused's mother dated October 10, in which she stated in part, "She [apparently accused's wife] wouldn't answer my letter, but I have news for you. I am working on something else and hope it won't backfire." When he could offer nothing definite as to the contents or ultimate arrival of these purported evidentiary documents and it was ascertained that accused was not using his counsel to aid in obtaining the evidence, the law officer refused to grant a further stay and ordered the trial to proceed.

As a consequence of this order, individual defense counsel immediately apprised the law officer that his client had instructed him to inform the law officer that the accused desired to discharge both civilian and military counsel. Obviously this delaying maneuver had been agreed upon before the hearing. In answer to an inquiry by the law officer, the accused stated that if he couldn't get a continuance, he would be required to release his lawyers as he had no defense. The law officer pursued the matter further and, in reply to another inquiry, the accused asserted he preferred to continue without counsel and he persisted in this attitude, even though the law officer explained fully the possible consequences and directed him and counsel to discuss the matter and ordered a recess for that purpose. When court reconvened, accused ended this part of the discussion by saying he had no faith in his defenders.

Trial counsel then joined in the proceedings by injecting a request that defense counsel be required to sit at the counsel table so that the accused might have the advice of a lawyer

should the occasion arise. Individual defense counsel parried this move by asserting it was not enough that counsel be available, for the defendant must have faith in those defending him and be ready to assist them in his defense. He then went on to say this:

". . . I think, sir, that you would be treading on thin ice here, and I would suggest you reconsider and give this man two or three weeks more. You have been very, very good to him this far, you have gone over backwards, and I realize there must be an end to it, but you have gone this far, and you have seen something in this very ambiguous letter, there might be something there, and I think you ought to consider that and give him one more recess."

After indicating he had leaned over backwards and would go even further if something more tangible than mere hopes of obtaining some undisclosed testimony was presented, the law officer found himself faced with a situation where he could obtain no assurance there was any evidence in existence. He thereupon stated:

"Now, the accused has requested that both counsel expressly be dismissed from this case. I would like to ask the accused, is it still your request, or have you given further thought to it?

"ACCUSED: It is still my request, sir.

"LO: Do you desire me to advise you any further as to the need for you to have counsel? Do you realize fully what you are doing, not to be represented by counsel in this case?

"ACCUSED: Yes, sir.

"LO: Do you know that counsel is for your protection, and that they are trained in the ways of the law, they know how to cross-examine, they know when to make motions, they know how to request instructions that the law officer must give the court in connection with the essential elements of the offenses with which you are charged? There are many technicalities that only a lawyer who is legally trained, legally qualified, can full appreciate in a court-martial proceedings. Do you understand that fully?

"ACCUSED: Yes, sir."

The law officer more carefully explained to the accused the benefits he might lose, but the latter remained adamant and the law officer finally complied with his demands and released counsel. Yet he did provide that military counsel must remain in the courtroom so that he might be available to act in behalf of the accused should the latter make such a request. Furthermore, individual counsel offered to and did remain to help the accused should his services be desired.

Thereafter, the accused entered a plea of not guilty, and the prosecution presented its case in chief. Though offered the opportunity to cross-examine Government witnesses, the accused refused, using a variety of excuses for his failure to take advantage of his right. However, he became a witness for the limited purpose of rebutting prosecution testimony on the voluntariness of his pretrial statement. Further, he took the witness stand in his own behalf after the completion of the prosecution's case to deny his guilt but principally to bring before the court-martial members his assertion that he should have been given further time to perfect his defense. Finally, when the issues were to be submitted to the court the law officer very painstakingly explained each instruction to the accused and, insofar as possible, made certain he understood the theories propounded.

In responding to the issue here certified, counsel for the parties have thoroughly briefed the question as to whether the accused effectively waived his right to counsel. In light of United States v Kraskouskas, supra, wherein we stated:

". . . As always, an accused can waive his right to counsel 'if he knows what he is doing and his choice is made with eyes open.' "

both concluded that under the Code such

a right can indeed be waived. In this they are correct for, as we ▪ indicated in that case, under both Article 38(b) of the Code, supra, and the Sixth Amendment of the Constitution the right to counsel is correlative to the right of an accused to defend himself. This latter right is universally recognized so long as a defendent is *sui juris* and mentally competent. Indeed the court should not force a lawyer not of his choice upon a sane defendant. Adams v United States, 317 US 269, 87 L ed 268, 63 S Ct 236 (1942); Carter v Illinois, 329 US 173, 91 L ed 172, 67 S Ct 216 (1946); United States v Steese, 144 F2d 439 (CA 3d Cir) (1944); Duke v United States, 255 F2d 721 (CA 9th Cir) (1958).

It might be of some importance to inquire into the reasons why the accused may waive such an important right. The Constitutional amendment —and necessarily Article 38(b) of the Code—reflect an enlargement of benefits afforded an accused. Historically, those who stood charged with a crime had no right to be heard through counsel. Accordingly, assistance of counsel afforded to those so charged was a decided gain, but accepting the benefit was not compulsory. The rigors of the common law were thus tempered but only to the extent of granting an additional right and not to the extent of barring the accused from acting in his own behalf.

Rule 44 of the Federal Rules of Criminal Procedure sets forth the practice now followed in Federal District Courts. The rule provides that where a defendant appears in court without counsel, the court shall advise him of his right thereto and assign him the same at every stage of the proceedings unless he is able to obtain representation or elects to proceed without counsel. The rule had its origin in the language of the Supreme Court defining the right to counsel in the cases of Johnson v Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019 (1938); Walker v Johnson, 312 US 275, 85 L ed 830, 61 S Ct 574 (1941); and Glasser v United States, 315 US 60, 86 L ed 680, 62 S Ct 457 (1942). It is largely a restatement of the principles enunciated in those decisions, but it is to be noted that the accused retains his privilege of electing to proceed without counsel. Accordingly, while one charged with an offense may be foolish to choose himself as his lawyer, he is free to make that choice.

We well recognize the general rule is that a waiver of this sort should not be accepted by a law officer ▪ cer unless it is shown to be intentional and with full knowledge of its consequences. The board of review approached the problem with this rule in mind but apparently concluded the law officer failed to make the penetrating and comprehensive examination required by the Federal civilian cases. The board placed much emphasis on the rationale of Von Moltke v Gillies, 332 US 708, 92 L ed 309, 68 S Ct 316 (1948). It interpreted that decision to mean that in every case it is the responsibility of the judge, before approving the waiving of counsel, to advise the accused: (1) of the nature of the charges; (2) of the statutory offenses included within them; (3) of the range of the allowable punishments thereunder; (4) of possible defenses to the charges and circumstances in mitigation thereof; and (5) of all other facts essential to a broad understanding of the whole matter. No doubt that is a comprehensive and excellent rule, but facts influence the duties placed upon a law officer, and to illustrate the point that these factors are merely guides and may be too comprehensive under different factual situations, we refer to Ossenfort v Pulaski, 171 F2d 246 (CA 5th Cir) (1948), where it was written:

"We do not consider the recent case of Von Moltke v Gillies, 332 US 708, 68 S Ct 316, and similar decisions, applicable or controlling in favor of appellee here. In the Von Moltke case, petitioner was a foreigner indicted during the recent war for conspiracy under the Espionage Act, 50 USCA §§ 32, 34. After her arrest she was held incommunicado for four days, except for consultation and advice with FBI lawyer-agents and United

States attorneys. She was charged with a capital offense, the penalty for which was death or imprisonment for as long as thirty years. Here, unlike petitioner in the Von Moltke case, Pulaski was permitted to remain free on bond until his conviction, and was afforded ample opportunity by the trial court to consult independent counsel of his own choosing, and apparently did so. By his own admission, he was a confirmed narcotic addict, and had been convicted on three previous occasions in the state courts. Moreover, he was familiar with court arraignment procedure in criminal cases."

But, even were we to test this case by the factors in the above-mentioned *Von Moltke* case, it is evident that accused made a clear and knowing waiver of his right. The law officer went to every reasonable length to persuade him to retain counsel. Accused's demands for additional time were outrageous and no one suggests the law officer's ruling on his last request for a continuance was an abuse of discretion. Accused was fully aware of the nature of the charges against him and any lesser offenses in issue, he had received the aid of counsel throughout a previous trial where all available evidence was developed and defense and prosecution theories exploited, he was aware of the punishment which had been imposed, he knew the overwhelming strength of the evidence against him and of the weakness of his own defense, and he had a full understanding of the advantages and disadvantages of his choice. He dismissed his own counsel and when it appeared they might be retained by the law officer he announced he had no confidence in them, but he rejected a suggestion for replacements. His assertion that he had no confidence in his counsel was a ruse which came too late and was in conflict with the record. Further, he had observed and had played a part in the development of issues in the first trial, and he was fully advised on the benefits of having a lawyer conduct the cross-examination of the witnesses and register objections. While the

board of review placed reliance on the fact that accused did not say he desired to represent himself, his behavior and statements, when coupled with the advice given him, supply those words. Certainly, this record convinces us that the accused independently, consciously, and with full knowledge of the consequences, chose to dismiss counsel and assume all risks incidental thereto. Never has there been a more intentional and preconceived decision by an accused.

Moreover, we believe it fairly inferable from the record that the accused was playing fast and loose with the court in hopes he could impose his will upon the law officer. His refusals to examine witnesses for the reasons assigned by him were nothing but attempts to force a further continuance. He knew the difficulties incident to the task he was to assume and yet when he offered his own incompetency as an alibi, and the law officer informed him counsel were present to assist, he rejected their services. By pretentions unsupported by facts he had delayed proceedings from July 1959 to October 1959, and, had evidence beneficial to him been in existence and available, his counsel could have obtained it before trial. He would not confide in his lawyers and no doubt that lack of confidence sprang from lack of evidence. His mystic approach to the problem, through the media of a suspicious mother, was a successful method of seeing to it that the materiality, relevancy, and competence of the evidence could not be determined by his own lawyers or the law officer. Having sat through the original proceeding and realizing the inevitable conclusion of a rehearing, he used the only method available to him to stay the obvious consequences of being forced again to stand trial. When an accused has rejected a fundamental privilege granted to him by law, when he has been reasonably and cautiously protected by the law officer during the trial, and when we find no miscarriage of justice, we are not disposed to furnish him with another opportunity to play the role of a dictator. We, therefore,

718

disagree with the conclusions of the board of review.

Since the case reached this Court, it has been called to our attention that depositions were used by the Government to supply evidence contrary to the rule announced in United States v Jacoby, 11 USCMA 428, 29 CMR 244. However, that is not quite accurate for here there was no objection to their use. This contention brings to the fore the risk an accused must assume when he elects to act as his own lawyer. It was obvious to the accused that he did not have the expertise of qualified counsel, but that inadequacy is not good reason to reverse this case. Once an accused has intentionally waived his right to counsel, the consequences flowing from that decision must be accepted by him, together with the benefits which he presumably sought to obtain therefrom. Smith v United States, 216 F2d 724 (CA 5th Cir) (1954). But more than that, there are special circumstances in this case which impel us not to bail out the accused from the consequences of his failure to object. At the first trial, an objection was registered and so the accused was not entirely uninformed. Moreover, in this trial, when the deposition of his wife was offered, the law officer twice advised the accused that he had the right to object. As on other occasions reflected by the record, the accused scorned the offer. Furthermore, help was at his elbow for the record shows he consulted with counsel who were present in court, and they were available at the time this objection should have been made. The mere asking by him would have brought them to his aid, but so long as he refused to permit their participation, the law officer was shackled. Considering the facts and circumstances on this facet of the controversy in their entirety, it appears clearly that United States v Jacoby, supra, and United States v Petterson, 11 USCMA 502, 29 CMR 318, are distinguishable.

For the foregoing reasons, the certified question is answered in the negative and the decision of the board of review is reversed. The record is returned to The Judge Advocate General for reference to the board of review for further action not inconsistent with this opinion.

QUINN, Chief Judge (concurring):

I agree with the principal opinion in regard to the accused's waiver of the right to counsel. As far as the deposition is concerned, if there was any error in its admission it was not prejudicial to the accused.

By other evidence, including a deposition to which there was no objection at the first trial, when accused was represented by counsel, it was established that the accused was formerly known as Leo Irven Cheers; that under the name of Cheers he had in Tennessee married Mary T. Smith on January 25, 1954; that under the name of Howell he married Melani Muller on August 25, 1958, in Zirndorf, Germany; that in his application to military authorities for permission to marry he represented he was free to marry. In connection with his application, the accused submitted what purported to be a photostatic copy of a divorce decree from Mary T. Cheers entered in Minute Book 35, page 72, of the Circuit Court of Rutherford County, Tennessee. A search of the records of that court by the Deputy Clerk showed no decree was issued on that date to the parties and the purported copy was not "a correct . . . copy of any official record" of the court. In a pretrial statement, the accused confessed that he had falsified the decree and that he was "presently still legally married." The deposition in issue was by Mary Cheers. It set out the circumstances of her marriage to the accused and that she knew of no divorce between them subsequent to 1954. Patently, her testimony was wholly cumulative and, therefore, could not have prejudiced the accused. I join in reversing the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

Unlike my brothers, I am of the view that the record establishes that the ac-

**719**

cused was deprived of his right to be represented by counsel in his trial by general court-martial. True it is that, rightly or wrongly, he elected to discharge appointed military and individual civilian counsel because he no longer had any faith in their competency to defend him. Contrary to the principal opinion, however, it nowhere appears in the record that he desired to represent himself or was offered new appointed counsel. The closest reference in the transcript is an inquiry by the law officer whether the accused knew "any particular counsel" he would like to have, and the answer: "Not in mind, sir." While the law officer on several occasions attempted to ascertain if Howell desired to proceed in the case without any attorney, the accused's replies uniformly indicated only that he did not wish to be defended by counsel previously appointed and retained. No effort was made by anyone at any time to clear the matter up and to offer the accused an opportunity to have other counsel appointed. Thus, it is clear that his rights were prejudicially invaded. United States v Bell, 11 USCMA 306, 29 CMR 122; United States v Kraskouskas, 9 USCMA 607, 26 CMR 387.

It is true, as we noted in *Kraskouskas,* supra, that an accused may insist upon defending himself and waive his right to be represented by an attorney. Adams v United States, 317 US 269, 87 L ed 268, 63 S Ct 236 (1942). Here, however, that situation is not present, for the record depicts no waiver of the right to counsel, but, rather, a desire not to be involved with those previously connected with the case. That was the conclusion reached by the board of review. And see United States v Gutterman, 147 F2d 540 (CA 2d Cir) (1945). The board's rationale is supported by the record, and I would affirm their findings here. United States v Alaniz, 9 USCMA 533, 26 CMR 313.

Completely apart from the foregoing, however, I believe that we must order a rehearing. While the question certified to us deals only with the question of counsel, we may also reach any other questions which materially affect the rights of the parties. Rules of Practice and Procedure, United States Court of Military Appeals, Rule 4. Scrutiny of this record indicates that it is based substantially upon the use of written depositions taken under circumstances which denied to the accused the right of confrontation. Absent application of the doctrine of waiver, use of such depositions requires reversal of the findings of guilty to which they relate. United States v Jacoby, 11 USCMA 428, 29 CMR 244; United States v Petterson, 11 USCMA 502, 29 CMR 318. At the time the taking of the depositions was ordered, accused noted in writing that he objected to the use of written interrogatories and desired the personal presence of his purported wife at the trial on the basis that he was "entitled to face his accusers." That written objection formed a part of the deposition presented to the law officer and admitted in evidence at accused's rehearing. The same objection was orally presented at accused's original trial, and I think it can be asserted unequivocally that the only reason it was not vocally repeated at the rehearing is the fact that accused was not there represented by counsel.

Surely, we cannot hold that the failure of this untutored accused to advance an objection based upon a purely legal proposition constitutes a waiver, particularly when that objection had been twice before asserted by his counsel. We have repeatedly refused so to act in trials by special court-martial on the sole basis that the defendants in those trials were not represented by legally qualified counsel. United States v Kelley, 7 USCMA 584, 23 CMR 48; United States v Beer, 6 USCMA 180, 19 CMR 306. By a parity of reasoning, it would seem even less sensible to enforce the rule requiring objection when an obviously untrained and naive defendant is engaged in the hazardous task of defending himself. See United States v Kraskouskas, supra, at page 610.

A similar case was recently decided before the United States Supreme Court. In Hudson v North Carolina, 362 US —, 4 L ed 2d 1500, 80 S Ct —

(1960), the Court was confronted with the plea of a defendant that he had been denied due process by the failure of a state court to appoint counsel to represent him on a felony charge. Reversal was ordered, not because of the failure to appoint counsel, but in view of the fact that, in the absence of counsel, no one at the trial took any action to purge the error inherent in permitting a codefendant to plead guilty in the presence of the jury which also heard the petitioner's case. Of that situation, Mr. Justice Stewart stated:

"The post-conviction court made no finding specifically evaluating the prejudicial effect of Cain's plea of guilt and the trial judge's subsequent failure to give cautionary instructions to the jury. In any event, we cannot escape the responsibility of making our own examination of the record. Spano v New York, 360 US 315, 316, 3 L ed 2d 1265, 1267, 79 S Ct 1202. *We hold that the circumstances which thus arose during the course of the petitioner's trial made this a case where the denial of counsel's assistance operated to deprive the defendant of the due process of law guaranteed by the Fourteenth Amendment. The prejudicial position in which the petitioner found himself when his codefendant pleaded guilty before the jury raised problems requiring professional knowledge and experience beyond a layman's ken.* Gibbs v Burke, 337 US 773, 93 L ed 1689, 69 S Ct 1247; Cash v Culver, 358 US 633, 3 L ed 2d 557, 79 S Ct 432." [Emphasis supplied.]

In like manner, the objection, the lack of which is here said to serve as the predicate for enforcement of waiver, required technical knowledge beyond accused's ken. Accordingly, I would give effect to the claims previously interposed by his counsel and apply the rule set forth in United States v Jacoby and United States v Petterson, both supra.

I would affirm the decision of the board of review.