**UNITED STATES, Appellee,**

v.

**Private E2 Joseph R. MIX (aka Robert J. Mix), 568–45–5452, United States Army, Appellant.**

**ACMR 8800256.**

U.S. Army Court of Military Review.

24 May 1991.

For Appellant: Captain Timothy P. Riley, JAGC, (argued), Lieutenant Colonel Russell S. Estey, JAGC, Terence J. Mix, Esquire (on brief).

For Appellee: Captain Jonathan F. Potter, JAGC, (argued) Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Gary L. Hausken, JAGC, Captain Timothy W. Lucas, JAGC (on brief).

Before De GIULIO, NAUGHTON, and VARO, Appellate Military Judges.

## OPINION OF THE COURT ON FURTHER REVIEW

VARO, Judge:

The appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was convicted of conspiracy to commit larceny, three specifications of desertion, violation of a general regulation by failing to store arms and ammunition in the arms room, two specifications of escape from confinement, destruction of government property, destruction of private property, larceny, arson, housebreaking, and breaking restriction. His numerous offenses were in violation of Articles 81, 85, 92, 95, 108, 109, 121, 126, 130, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 885, 892, 895, 908, 909, 921, 926, 930, and 934 [hereinafter UCMJ]. The appellant's adjudged and approved sentence provides for a dishonorable discharge, confinement for twenty-five years, reduction to the grade of Private E1, and total forfeitures.

On 4 January 1990, this court set aside the action of the convening authority because the appellant, representing himself, *pro se*, at trial and for the submission of post-trial matters, had not been served with the staff judge advocate's post-trial recommendation. *United States v. Mix*, 29 M.J. 956 (A.C.M.R.1990).[1] Because of the improper service, the appellant's post-trial submissions under Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1105 were not considered. The appellant's case was sent to the Commander, United States Army Combined Arms Center and Fort Leavenworth (Provisional). A new post-trial recommendation was prepared and properly served. On 20 September 1990, the appellant's sentence was again approved as adjudged.

Although the appellant has raised several errors personally and through counsel, the primary issue before us is the military judge's determination to allow the appellant to represent himself, as set forth in the first two assignments of error.[2] Specifically, the appellant asserts that the military judge erred by allowing him to waive assistance of counsel. The appellant further asserts that the military judge erred by accepting the appellant's waiver of counsel because his request to proceed *pro se* was not clear and unequivocal. We disagree on both issues, and hold that the record of trial establishes that the appellant was competent to defend himself, that he was fully advised of and understood the ramifications of defending himself, and that his request to proceed *pro se* was voluntary and understanding.

### I

The appellant did not defend himself *pro se* throughout the entire proceedings. At the outset, the appellant was represented by two military trial defense counsel, Major A and Captain B. Because of a potential conflict of interest regarding another case, the lead counsel, Major A recused himself from the case. The assistant defense counsel handled initial matters in the case but forwarded the appellant's request to retain Major A despite the conflict. This request was denied. The military judge eventually ordered Major A be made available for this case.

Following this determination, the military judge again advised the appellant of his rights to counsel. The appellant stated

---

1. In returning the case for a new review and action, this court did not address any of the other issues raised by the appellant in his original appellate submission.

2. Before this court, the appellant is represented by appointed military appellate defense counsel and by civilian counsel (on brief). At a hearing held on 1 April 1990, the appointed military appellate defense counsel clarified issues which the appellant is not raising before the court: the appellant is not contending that he was not mentally responsible either at the time of the offenses, or at the time of trial; and, the appellant is not contending that he was not competent to *participate* in his defense at trial. Following questioning by the court, appellant's counsel stated that there also is no contention that the appellant is not competent to participate in his appeal. Counsel further stated that while some of the appellant's written submissions were not always clear, he (counsel) had clear conversations with the appellant and he had no question about the appellant's competency to participate in the appellate process.

that he wanted to be represented by his uncle from California.[3] Contact with the appellant's uncle by the military defense counsel revealed that the appellant's uncle had no involvement in the practice of criminal law and, therefore, had no interest in representing appellant at trial. The appellant advised the military judge that he did not believe his defense counsel, and further, that if his uncle could not defend him, he would like to defend himself. As noted in the following colloquy, after further discussion with the military judge, the appellant decided to keep his two military defense counsel, at least until he was able to further confer with his uncle.

ACC: If I can't get my uncle, I don't want a lawyer.

MJ: What do you mean you 'don't want a lawyer'?

ACC: I trust him and stuff; he's my uncle.

MJ: I understand that. Okay, you said if he won't defend you, you don't want a lawyer?

ACC: Uh—

MJ: Is what you're saying, you want to represent yourself?

ACC: Well—I'm not sure how to represent myself, but—I just don't want a lawyer.

MJ: You have the right to represent yourself; I'm not going to force a lawyer on you, any particular lawyer, but if you choose to represent yourself, you're going to have to comport with the rules of evidence and rules of law. Do you understand that?

ACC: [No response.]

MJ: In other words you're going to have to behave like a lawyer if you want to defend yourself, that ... is [if] you don't want another lawyer. Do you understand?

ACC: I do.

MJ: Now in order to assist you in doing that, I would require that you have a lawyer at the table present to advise you so that you could ask them questions on

procedure, because it would not be my place and I cannot defend you ..., advise you and ... tell you what to do. Do you understand that?

ACC: [Moving his head in an affirmative manner.]

MJ: So if you choose to defend yourself, to ... cross-examine the witnesses, to make argument, you have that right too, but before you do that, I would have a lawyer present, available for you, sitting at the table so that you could turn to them for advice on how to properly do that. Do you understand that?

ACC: I don't really—I don't trust 'em.

MJ: I understand what you're saying, but do you understand what I'm saying?

ACC: [No response.]

MJ: In other words so that you knew how to ask the questions, so that you knew what the procedure was, you could turn to the lawyer and say, 'Okay, ... how do I do that?' and they would give you advice.

ACC: I don't want to represent myself; I want my uncle to represent me.

MJ: Okay, but what if your uncle says he won't?

At this point in the discussion, the appellant again stated that he wanted his uncle to represent him, and that he wished to talk to his uncle. The military judge then directed the trial defense counsel to assist the appellant in contacting his uncle. During the next recess, the appellant was able to reach his uncle only to confirm that his uncle would not be able to represent him. The appellant then advised the military judge that he wished to retain his two military counsel for the present time. The appellant continued with his two military trial defense counsel through all motions. Just prior to the assembly of the court with members, however, the appellant again stated:

ACC: I don't want any lawyers.

MJ: Okay, Private Mix, what do you mean you don't want any lawyer?

---

**3.** The appellant's uncle is the civilian attorney currently representing him (on brief) before this court on appeal.

ACC: I don't want Captain B or Major A.

MJ: Okay, then who is going to defend you?

ACC: (No response.)

MJ: Do you intend to try and defend yourself?

ACC: Yes.

MJ: Okay, do you understand, Private Mix, if you desire to do that—you have the right to do that, but do you understand if you want to do that, I'm going to hold you to the standards of a lawyer? In other words—and if you desire to take the stand, it is going to be necessary that you have a lawyer ask you the questions. You can write them out for them if you desire, but you are going to have to have a lawyer to ask you the questions. Because once you take that witness stand, you become a witness. Do you understand that?

ACC: Yes.

MJ: Okay, now are you telling me that you want to conduct all the voir dire and you want to do everything yourself?

ACC: (Indicated in the affirmative.)

The military judge advised the appellant that he would release Captain B and Major A, but that they would be available to assist the appellant on questions of law. The discussion then continued:

MJ: Okay, are you telling me that you want to defend yourself?

ACC: Yes.

MJ: Do you understand that even though you don't trust the lawyers, it is necessary that you have someone there to advise you concerning what the law is? In other words, if you ask a question and it is objected to, you are going to have to justify the question legally, and the purpose behind a lawyer is to give you the advice so that you know what to say. Do you understand that?

ACC: (Indicated in the affirmative.)

. . . .

MJ: Okay, you have the right to be defended by a lawyer. You have the right to defend yourself; do you understand, right?

ACC: (Indicated in the affirmative.)

MJ: Okay, and what do you want to do. You tell me in you own words exactly what you are after, what you want to do.

ACC: I don't want them anywhere around me, and I want a—I want a different lawyer.

MJ: Who do you want?

ACC: (No response.)

. . . .

MJ: ... Do you intend to defend yourself; you want to defend yourself?

ACC: Yes.

. . . .

MJ: Okay. And what you are saying is, you want a different lawyer available to assist you in defending yourself?

ACC: Yes.

MJ: To advise you concerning questions of law?

ACC: Yes.

. . . .

MJ: In other words, you are going to come into court, and you want me to have a lawyer sitting next to you, who is totally unfamiliar with the posture of the evidence. In other words, what the charges are, with the pretrial investigation, what the investigation is, and you want me to have him there just to give you an assist as to whether or not questions are permissible and things of that nature. Now, if you do that, what you are doing is you are coming in here and you are going to let the Government present their evidence, their counsel, and you are going to come against them without a counsel, and you are facing potential confinement. Do you understand that? You know your past behavior has shown that you don't desire to remain in confinement. Do you understand that?

ACC: (Indicated in the affirmative.)

. . . .

MJ: Do you understand that a lawyer is the best way to defend yourself?

ACC: I don't trust them.

. . . .

MJ: What makes you think you are going to trust the next lawyer?

ACC: I'll try.

MJ: But what you are telling me is you want to defend yourself.

ACC: (Indicated in the affirmative.)

....

MJ [after appointing CPT L to assist the appellant]: .... Okay, Private Mix, you indicated to me that ... you desire to represent yourself and have Captain L to advise you. Now, do you remember the warning I gave you earlier about disrupting the proceedings?

ACC: Yes.

MJ: Now, if, as counsel, you disrupt the proceedings, do you understand the trial is going to continue?

ACC: Uh-huh.

MJ: And do you understand that you are going to give up your right to defend yourself, if you become too disruptive?

ACC: (Indicated in the affirmative.)

MJ: Do you have any questions about that?

ACC: (Indicated in the negative.)

MJ: Now do you understand the danger in defending yourself?

ACC: (No response.)

MJ: In other words, you are a ... non-trained lawyer—

ACC: Yes.

MJ: You are not a lawyer, you have no legal training, do you?

ACC: (Indicated in the negative.)

MJ: Okay, ... do you know ... what we call the elements of the offenses, the parts that are necessary to prove the offense?

ACC: No.

MJ: That is right, you don't know anything about the law, and that is the question. And you know, several times issues can turn on just whether the Government can prove one of the elements.... Do you understand that?

ACC: (Indicated in the affirmative).

MJ: And it is necessary that you understand what the elements are. Now, do you understand what the danger is in not understanding them and trying to defend yourself? In other words, you are not going to know what to attack, where is

the essential areas. Do you understand that?

ACC: (Indicated in the affirmative.)

MJ: Are you sure you want to do that?

ACC: (Indicated in the affirmative.)

MJ: Do you understand the danger ... [of what] you are doing?

ACC: (No response.)

MJ: In other words, what makes you think you are competent to defend yourself? Why do you want to defend yourself?

ACC: I don't trust my lawyers. There is no one else.

....

MJ: Okay.... at this stage ... I'm going to allow you to defend yourself, because you have that right—

ACC: Okay—

MJ: I'm going to have Captain L present at counsel table for you; do you understand that?

ACC: Uh-huh.

The discussion concluded with the military judge again advising the appellant that should he become disruptive, Major A and Captain B would take over the defense. The appellant agreed with this procedure. Major A and Captain B were directed to remain in the back of the courtroom and take notes if desired. They were also directed not to advise the appellant or Captain L regarding trial tactics, as this was a matter now within the responsibility of the appellant as counsel for himself.

## II

Before this court, the appellant urges that there are, by law, two distinct levels of competency which must be reached before self-representation may be allowed. The appellant asserts that his competency must be tested first to determine if he is able to participate at trial. A further, more comprehensive test is proposed to determine if, while competent to *participate,* an accused is competent to *conduct* his own defense.

The appellant cites *United States v. Tanner,* 16 M.J. 930 (N.M.C.M.R.1983), in support of his position. In *Tanner,* the Navy Court set forth what it labeled as the "con-

stitutionally minimum standard of inquiry necessary to establish a valid and effective waiver of representation." This standard was drawn directly from *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948):

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Tanner*, 16 M.J. at 935, *quoting Von Moltke*, 332 U.S. at 724, 68 S.Ct. at 323.

The appellant correctly notes that the *Von Moltke* language has, in the past, not been considered to be a concrete rule. Rather, it has been looked upon as general guidance to be considered by judges. *United States v. Howell*, 29 C.M.R. 528, 533 (C.M.A.1960).

■ Citing *United States v. Freeman*, 28 M.J. 789 (N.M.C.M.R.1989), the appellant asserts that the "constitutionally minimum" standard of *Tanner*, applying *Von Moltke*, has now become a clear rule rather than a guide. The appellant bases this conclusion on *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in which the Supreme Court established that the right of self-representation is constitutionally based in the Sixth Amendment. We disagree with appellant's position that *Faretta* makes the *Von Moltke* standards mandatory. Therefore, we do not accept the Navy Court's position in *Freeman* that requires the military judge to formally establish a second, greater level of competency for an accused who wishes to represent himself.[4]

Although *Faretta* cites *Von Moltke*, it really establishes a standard of its own on the issue of self-representation:

> When an accused manages his own defense, he relinquishes, as a purely factu-

al matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. *Johnson v. Zerbst*, 304 U.S. [458] at 464–465, 58 S.Ct. [1019], at 1023 [82 L.Ed. 1461 (1938)]. Cf. *Von Moltke v. Gillies*, 332 U.S. 708, 723–724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' *Adams v. United States ex rel. McCann*, 317 U.S. [269] at 279, 63 S.Ct. [236] at 242 [87 L.Ed. 268 (1942)].

*Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. This standard is much broader than that of *Von Moltke* and provides general guidelines rather than specific rules. It in no way provides that an accused must have a "higher level" of competence to defend himself as the appellant asserts. Rather, it merely establishes that an inquiry must be made on the record to insure that one who chooses self-representation knows what he is doing.

### III

The current standards regarding the right of self-representation before courts-martial are set forth in Rule for Courts-Martial 506(d):

> (d) *Waiver.* The accused may expressly waive the right to be represented by counsel and may thereafter conduct the defense personally. *Such waiver shall be accepted by the military judge only if the military judge finds that the accused is competent to understand the disadvantages of self-representation and that the waiver is voluntary and*

---

**4.** We also note that *Freeman* is quite distinct from the case at bar as it entailed a significant question of the accused's mental responsibility in addition to the question of competency to represent himself. In our view, this mixing of issues can cause the reader of *Freeman* to mix the standards.

*understanding.* The military judge may require that a defense counsel remain present even if the accused waives counsel and conducts the defense personally. The right of the accused to conduct the defense personally may be revoked if the accused is disruptive or fails to follow basic rules of decorum and procedure. (Emphasis added).

These standards are taken directly from the Manual for Courts–Martial, 1969 (Rev. ed.), and *Faretta v. California. See,* Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 506(d) analysis, app. 21, at A21–27. Therefore, our decision rests on whether the military judge had sufficient information to find that the appellant was competent to understand the disadvantages of self-representation, and whether the appellant's waiver of counsel was voluntary and understanding.

■ In this regard, on 10 November 1987, the military judge directed that the convening authority inquire into the mental responsibility and capacity of the appellant. Paragraph 3d of his order directed that the following specific question be addressed as required by Rule for Courts–Martial 706(c)(2)(D):

d. Does the accused have sufficient mental capacity to understand the nature of the proceedings and to *conduct or cooperate intelligently in the defense?"* (Emphasis added.)

On 18 December 1987, a sanity board consisting of two psychiatrists and one psychologist rendered its report which included the following response to the above question from the military judge:

d. The accused has sufficient mental capacity to understand the nature of the proceedings and to *conduct or cooperate intelligently in the defense*—although he may choose not to do so. (Emphasis added.)

The appellant asserts that the language, "conduct or cooperate," in these documents is *pro forma* in nature because of the language of Rule for Courts–Martial 706

and, therefore, should not be considered to have truly addressed the issue of self-representation. We disagree. The appellant has shown no basis for his assumption that the language from the sanity board should be interpreted any other way than it is clearly written, *i.e.,* that the appellant was competent to conduct or cooperate in his defense.

The appellant also asserts that this court should ignore the November 1987 sanity board and, instead, rely on an August 1990 psychological evaluation of the appellant.[5] On 24 August 1990, the evaluating psychologist concluded that "[i]t is *possible* that, at the time of his trial, the appellant *may* have suffered from a severe mental disease that rendered him incompetent to participate in handling his own defense." (Emphasis added). The court has not been presented nor has it found any basis to ignore the November 1987 sanity board and accept the speculations of the August 1990 psychological evaluation.

■ Our review of the colloquy between the military judge and the appellant leads us to conclude that the military judge did not err in allowing the appellant to represent himself. The military judge repeatedly questioned the appellant about his desire and intent. He advised the appellant on several occasions about the benefits of having a lawyer. He also advised him of the dangers of representing himself, noting that the appellant was not familiar with the specific elements the government would have to prove nor of the possible defenses available. The military judge called the appellant's attention to the fact that he would be at a great disadvantage because the government would be represented by a lawyer. Despite this counseling, the appellant clearly continued his request to represent himself. Based on our review of the sanity board and the in-depth continued colloquy between the military judge and the appellant, we have no doubt that the military judge was correct in determining that the appellant was "competent to un-

**5.** This evaluation was completed by a psychologist at the request of the military trial defense counsel who assisted the appellant following

this court's initial return of the record of trial for a new review and action.

derstand the disadvantages of self-representation and that the waiver [was] voluntary and understanding." Rule for Courts–Martial 506(d).

■ We also note that the issue of the appellant's competence was raised again later in the trial. In our opinion, the military judge's determination to allow the appellant to continue to represent himself was well-founded. By this time in the trial, the appellant had made appropriate challenges, asked appropriate questions, and raised appropriate objections to several government questions. Although he regularly sought the advice of the legal advisor provided by the court to assist him, the record of trial reveals that once the members had been impaneled, the defense function was fully and adequately under the control of the appellant. We recognize that the appellant's performance at trial cannot become the basis which establishes his state of mind at the time he requested self-representation. *United States v. Mogavero,* 20 M.J. 762 (A.F.C.M.R.1985). However, once the military judge makes an appropriate determination of competency, as he did in this case, we believe consideration of the appellant's conduct of the trial to be relevant because it supports the military judge's original conclusion that the appellant clearly knew what he was doing.

The assignments of error that the military judge erred in allowing the appellant to proceed *pro se* and that the appellant's request to do so was not clear and unequivocal, are without merit.

## IV

In his third assignment of error, the appellant asserts that the military judge erred by admitting into evidence two weapons (a pistol-gripped shotgun and a semi-automatic rifle) seized from the appellant's car. These weapons were seized after a search authorization was granted by the appellant's battalion commander. The appellant asserts that the battalion commander did not have sufficient information upon which to make a probable cause determination. The appellant further asserts that

the search occurred in an area not under the control of the battalion commander.

■ In admitting the evidence, the military judge found sufficient probable cause. The military judge agreed with the appellant that the search was conducted in an area outside the control of the battalion commander, but he found the search had been done in good faith. We concur with the military judge's determination and find no error.

The search resulted from a report to the appellant's company commander that the appellant had been seen with "exotic weapons." The company commander searched the appellant's room under his own authority, but found no weapons. He then called the battalion commander to request authority to search the appellant's car. The source of the company commander's information that the weapons might be in the car asked that his name not be given to the battalion commander. He was not an anonymous source, however, for the company commander knew him personally. When the battalion commander asked general questions about the source, the company commander told him that the source was a soldier of good quality and good reputation. The battalion commander also was told that the appellant had been seen driving his car on the previous day at a time when the appellant was restricted to the general barracks area because of punishment imposed on him under Article 15, UCMJ.

In our opinion, judging the totality of the circumstances, the battalion commander had sufficient credible information to justify his determination of probable cause. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Manual for Courts–Martial, United States, 1984, Military Rules of Evidence 315(c)(2) [hereinafter Mil.R.Evid.]. *See United States v. Wood,* 25 M.J. 46 (C.M.A.1987).

■ With regard to the location of the car when searched, the government questions the military judge's determination that the parking lot where the car was located was not an area under the control of the battalion commander. Mil.R.Evid.

315(d)(1). We see no need to resolve that issue. There is no evidence in the record of trial which indicates that the battalion commander "abandoned his detached and neutral" role in making the probable cause determination or in believing he had some authority over the parking lot in which the appellant's car was located. Although the search may have occurred outside the battalion area, the close proximity of the parking lot to the battalion leads us to agree with the military judge that the search was conducted in a good faith belief that it was properly authorized. Mil.R.Evid. 311(b)(3)(C); *United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).[6]

### V

We have considered all other issues raised personally by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and through counsel, and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge De GIULIO and Judge NAUGHTON concur.

---

**6.** *But see United States v. Morris,* 28 M.J. 8, 12 (C.M.A.1989), wherein Chief Judge Everett expresses, in dicta, that the good faith exception should be applied in courts-martial only to searches based on warrants or authorizations issued by military judges or military magistrates.