The STATE of Ohio, Appellee,

v.

CLINE, Appellant.

[Cite as *State v. Cline,* 164 Ohio App.3d 228, 2005-Ohio-5779.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2002–CA–5.

Decided Oct. 28, 2005.

Nick A. Selvaggio, Champaign County Prosecuting Attorney, for appellee.

Virginia L. Crews, for appellant.

———————

FAIN, Judge.

{¶ 1} This appeal of defendant-appellant, James M. Cline, from his conviction and sentence on multiple counts has been remanded to this court after our initial judgment, rendered on September 5, 2003, was reversed by the Ohio Supreme Court. *State v. Cline,* 103 Ohio St.3d 471, 2004-Ohio-5701, 816 N.E.2d 1069, reversing 2003-Ohio-4712. The opinion of the Ohio Supreme Court was based upon its recent decision in *State v. Martin,* 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, in which it held that it is not necessary to comply literally with the requirement in Crim.R. 44(C) that the right to counsel in a case involving a serious offense must be waived in writing—that substantial compliance with the requirement of the rule is sufficient.

{¶ 2} We have applied the concept of substantial compliance set forth in *State v. Martin* to the facts in the record in this case, and we conclude that the trial court did not substantially comply with the requirements for waiver of counsel set forth in Crim.R. 44(C). Accordingly, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

I

{¶ 3} The facts, as set forth in our earlier opinion rendered on September 5, 2003, are as follows:

{¶ 4} "In the past Cline was convicted of harassing women who had declined to pursue relationships with him, and the trial court ordered probation. However, his probation was later revoked, and Cline was sent to prison. After his release, Cline embarked upon a series of actions that resulted in the charges contained in the two indictments involved in this case.

{¶ 5} "Between December, 1999, and the beginning of 2000, Cline met Robin Rabook, Betty Jean Smith, and Sonja Risner in internet chat rooms. After several dates with each of the three women, they declined further contact with him. As a result, Cline began to harass the women by e-mail and by telephone, at all hours of the day and night. In an apparent attempt to take revenge against the three women, Cline used his knowledge of computers and the internet, along with the women's personal information, to create havoc in their personal lives. For example, Cline locked the women out of their Internet accounts, and he scheduled dates for the women, unbeknownst to them. He used

their names to send vulgar messages to others, and he sent vulgar messages about the women to others.

{¶ 6} "Cline also stalked Sonja. In September, 2000, Cline solicited the assistance of another woman whom he met on the internet to burn down the house where Sonja lived. That woman, Gina White, warned Sonja of sabotage to her car, and a mechanic found a mothball in the gas tank. Cline also began an intensive program of telephone harassment of Sonja. He called her repeatedly at home, and after she changed her number, he called her at work. He then began to call people all over Urbana trying to get Sonja's new phone number. Cline also ordered magazine subscriptions in her name, caused deliveries to be made to her home, advised realtors that she wanted to sell her home, and arranged to have her car towed. Cline gave Sonja's work number to many people, encouraging them to call her there. During a two-month period, Cline made over 3,000 phone calls.

{¶ 7} "While Cline was in jail in Indiana awaiting extradition to Ohio, he began writing Sonja's personal information and physical description in books in the jail, and encouraging prisoners to write to her, which several of them did. During this time, Cline continued to pursue plans to burn down her house." 2003-Ohio-4712 at ¶ 4–7.

{¶ 8} Cline was charged with multiple counts of unauthorized use of a computer, menacing by stalking, conspiracy to commit aggravated arson, criminal mischief, intimidation of a crime witness, and telecommunications harassment, having previously been convicted of telecommunications harassment. After the voir dire of the jury, Cline moved to represent himself. The trial judge told Cline that he didn't think that was a good idea, but ultimately permitted him to represent himself at the trial, although the attorney who had been assigned to represent him was required to remain available, during the trial, for consultation at Cline's initiative. Cline represented himself vigorously during the trial.

{¶ 9} At the end of the state's case, seven of the counts were dismissed at the state's motion. The jury acquitted Cline of two counts, but convicted him on a total of 76 counts. He was sentenced to a total of 67 1/2 years, out of a possible maximum of 87 years. From his conviction and sentence, this appeal was taken.

{¶ 10} In our original decision, we concluded that because Cline's waiver of his right to counsel had not been in writing, as required by Crim.R. 44(C), his conviction and sentence, on all counts, had to be reversed, with the cause to be remanded. Cline had assigned a number of other errors. We treated all but two of these as moot, in view of our disposition of his assignment of error involving the waiver of his right to counsel. One of the two assignments of error that we did address was a speedy-trial issue. We overruled that assignment of error. The other assignment of error asserted insufficient evidence. We sustained that

assignment of error in part, concluding that there was insufficient evidence, as a matter of law, to convict Cline on one count of menacing by stalking and ordered him discharged as to that offense. We overruled the assignment of error in all other respects, concluding that there was sufficient evidence to support Cline's other convictions.

{¶ 11} The state perfected an appeal of our judgment to the Ohio Supreme Court, which reversed our judgment and remanded the cause to us. *State v. Cline*, 103 Ohio St.3d 471, 2004-Ohio-5701, 816 N.E.2d 1069. Cline's appeal is again before us pursuant to the mandate of the Ohio Supreme Court.

## II

{¶ 12} Cline's first assignment of error is as follows:

{¶ 13} "The trial court erred by allowing appellant to proceed pro se without executing a written waiver to the right to counsel."

{¶ 14} Crim.R. 44(C) provides:

{¶ 15} "Waiver of counsel shall be in open court and the advice and waiver shall be recorded as provided in Rule 22. In addition, in serious offense cases the waiver shall be in writing."

{¶ 16} A serious offense is defined as any felony and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months. Crim.R. 2(C). The state has never disputed the application of Crim.R. 44(C) in this case.

{¶ 17} In reversing our original judgment on appeal, the Ohio Supreme Court cited, without further comment, *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, a decision it had rendered just two weeks before its decision in this case. In *Martin*, the Supreme Court held that although Crim.R. 44(C) requires that the waiver of the right to counsel, in the case of a serious offense, be in writing, literal compliance with this requirement is not necessary— substantial compliance with the rule will suffice. Id., at 392, 816 N.E.2d 227. The court held that "when a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." Id.

{¶ 18} In describing the warnings Martin had received, the court stated:

{¶ 19} "The trial court cautioned Martin at times that it would be best if Martin were represented by counsel ('I would caution you against abandoning your lawyers but that's your choice'). But the court did not adequately explain the nature of the charges, the statutory offenses included within them, the range

of allowable punishments, possible defenses, mitigation, or other facts essential to a broad understanding of the whole matter, per *Von Moltke* [*v. Gillies* (1948) ], 332 U.S. [708] at 724, 68 S.Ct. 316, 92 L.Ed. 309, and [*State v.*] *Gibson,* 45 Ohio St.2d [366] at 377, 74 O.O.2d 525, 345 N.E.2d 399." Id., at 393, 816 N.E.2d 227.

{¶ 20} The Ohio Supreme Court concluded that because of these and other deficiencies, "[t]he trial court failed to substantially comply with Crim.R. 44(A) by failing to make a sufficient inquiry to determine whether Martin fully understood and intelligently relinquished his right to counsel." Id.

{¶ 21} In the case before us, as in *State v. Martin,* the trial judge commendably attempted to persuade Cline that he was making a mistake by seeking to represent himself. The colloquy between Cline and the trial judge is worth setting out herein, since the sufficiency of that colloquy under *Martin* is the issue. Assigned counsel had just informed the trial court that his client wanted to represent himself. The following colloquy ensued:

{¶ 22} "THE COURT: Excuse me, what we are discussing now is whether you want to represent yourself.

{¶ 23} "DEFENDANT CLINE: Yes, sir.

{¶ 24} "THE COURT: Do you understand that if I authorize you to represent yourself that you're held to the same standard as attorneys would be in the types of questions that you can ask and the things that you can do?

{¶ 25} "DEFENDANT CLINE: Yes, sir. Although I know that is confusing matters, since I'm not, per se, a lawyer, I have no, you know, legal background, no education other than a business law class in law. That is the only thing I had for education for law.

{¶ 26} "THE COURT: There are a number of people who believe they want to represent themselves, but the basic rule is if they do they're held to the same standards.

{¶ 27} "DEFENDANT CLINE: I'm sure if I went outside your standards or guidelines, then you or someone in here would correct me on that. Right?

{¶ 28} "THE COURT: That is true.

{¶ 29} "DEFENDANT CLINE: Fine.

{¶ 30} "THE COURT: And you believe that that is the most effective way for your case to be presented is for you to be the attorney?

{¶ 31} "DEFENDANT CLINE: Well, as me and Mr. Feinstein have not gotten along, and there is a motion right here that—it was for Case Number 2001CR–87, State of Ohio versus Patrick Davidson, it was a motion that was filed by Richard Nau, all right, for a motion to disclose exculpatory evidence.

{¶ 32} "Now I wrote him and said, why can't we file this motion? And he says, we don't need to.

{¶ 33} "So then I turn around and I rewrote in my own handwriting and submitted it to you for a sustained or other ruling, which I believe it was sustained.

{¶ 34} "So that was part of my reason was why isn't he filing motions because in several of your journal entries he was saying—you were saying, rather, that the Defendant may file anything within the Criminal Rule guidelines. And I kept saying to myself, whey isn't he doing said things?

{¶ 35} "And on the November 29 meeting you had asked him for his version of the time computation versus what the prosecution had submitted to you, and he didn't submit. He submitted my own calculations and he just said, I agree with him. And I felt that he should have come up with something a little more extravagant than that to present to yourself.

{¶ 36} "THE COURT: Attorney Feinstein, as an attorney admitted to the practice of law, is an officer of the court. And officers of the court don't present extravaganzas just because clients want them to.

{¶ 37} "Attorney Feinstein is very familiar with the workings of courts in general and this court in particular. And if he chooses to formulate an opinion as to what is best or what isn't, it doesn't make any difference what has happened in another case. He evaluates what is needed in this case.

{¶ 38} "There could be totally different reasons that it would have created motions or rulings in other cases. The fact that the Court may have granted your motion may not have had anything to do with his opinion.

{¶ 39} "The Court's placed in a sensitive situation when individuals file their own pleadings. You'll note that after that first round of pleadings that you filed, when you filed the next one the Court said that they were not timely filed. The first ones weren't even timely filed. I would suspect that attorney Feinstein believed that he had the information that he needed on your behalf without the necessity to file a motion because that information was provided by the Prosecutor as part of discovery.

{¶ 40} "But we digress. You've explained to me why you have concerns about Attorney Feinstein. I have responded in saying that I don't have the same concerns. I believe Attorney Feinstein knows how to manage responsibilities to the client as well as responsibilities to the Court. I believe that he has a finer developed sense of that than most, if not all, of any clients that he may represent. I can't speak for you and whether you agree with that feeling. All I can say is that he remains your attorney up to this point because the Court believes that he can do the job that his training has helped prepare him to do. If you feel

differently and you choose to represent yourself, you have that right. It's very— I started to say dangerous right but a difficult right to exercise because those who represent themselves sometimes lose the perspective that members of the bar have been trained to achieve by their practice and by their experience.

{¶ 41} "But the choice will come down to you since I've been faced with the question. If you have another question in relation to that decision, I'll try to answer it. But we are going to be coming to the point very shortly where you have to decide what it is you want to do.

{¶ 42} "DEFENDANT CLINE: It's not necessarily a question but another piece of information. First plea offer that was offered by the prosecution had—I don't want to get into all the specifics, but I will say that my attorney had apparently not looked it over carefully because as I was looking through there I saw multiple things that I considered to be of major concern, whether partake in lying or whether partake in not enough evidence based upon what I have seen of the discovery packet, et cetera, et cetera. And that was just another reason why, you know, Mr. Feinstein and myself have not been seeing eye to eye.

{¶ 43} "THE COURT: The Court has some difficulty in responding to that statement because I think you know that philosophically this court doesn't engage in the plea bargaining process. If the parties choose to reach some agreement, than that can be presented to the Court; but I don't discuss plea bargaining with each lawyer or with the client.

{¶ 44} "If you say that you and your lawyer had a difference of opinion on a plea bargain, and that is in quotes, that was offered by the State, that frequently happens. Individuals who are charged with crimes have one perspective. Lawyers who represent those individuals have another perspective. I can't comment more than that on whether your beliefs are more valid than Attorney Feinstein's. All I can say is I'm not involved in that process.

{¶ 45} "You're telling me that because of things that you've seen, you question whether Attorney Feinstein is placing your best interests first. I can only assure you that the Court believes that he does that not only with you but with every client he represents in this court.

{¶ 46} "DEFENDANT CLINE: If I may interject again then, I have written several letters to various organizations and Appeals Court Judge Walter Herbert Rice. [Sic.] I've written to the ACLU, to our Governor Bob Taft; and I've expressed my concerns to all these people with a—I believe it was a two or four page letter outlining my concerns and have received various responses from them concerning my case, none of which have been—none of which has helped me to get another attorney per se but it was nonetheless searching for other answers and other alternate avenues.

{¶ 47} "THE COURT: I understand what you're saying. I'm relatively sure that none of those officeholders that you mentioned have done anything to change the progress of the case here because it's not within their purview to do that. They are designated by law to do certain things whether they be judge or governor or attorney general but none of those relate to how this case proceeds. So that is why we are here today is because even though you may have made other people aware of your feelings, hasn't been their place to step into this situation.

{¶ 48} "DEFENDANT CLINE: Well, I really couldn't understand why you had overruled my motion requesting to have some somebody else represent me the first time back with the facts that are on the 14th and the motion on the 17th.

{¶ 49} "THE COURT: It's called lawyer shopping. There has been no establishment that Attorney Feinstein is not capable or not an appropriate person. You may have disagreements with him; but if you're saying that you have a disagreement with your lawyer is a basis to change lawyers, change would happen all too often.

{¶ 50} "We've had an attorney representing you from the very early stages of this case, and the request to change attorneys can't be used to delay the case going forward. And that would have necessitated—the changing of attorneys would have been another continuance. And if you'll recall, you've expressed your displeasure over how long this case has taken to come to this point already.

{¶ 51} "The Court believes that we needed to go forward and that the person that represents you is capable of going forward. That is why the Court overruled it. So this person could retain his accumulated knowledge, and we can continue with this case.

{¶ 52} "DEFENDANT CLINE: However, that still—I still have the right or to be expressly opinionated [sic] with myself here as far as my dislike for how he's representing me thus far.

{¶ 53} "THE COURT: Certainly.

{¶ 54} "DEFENDANT CLINE: All right. And I have made that intention known by sending you the fax letter, by sending you the motion and having him send the motion as withdrawal. And I just want to make sure it was on the record that I still did not feel he was representing me even though you yourself may feel that way and I was not trying to get a continuance of an outrageously number, number weeks or whatever. I was just looking to see someone who was going to pursue this matter the way I felt that it should have been because one letter that he had sent me was look, you're the client. I'm the lawyer. I'm going to tell you what to do.

{¶ 55} "And if I, if I was working behind the counter at McDonald's and I walked in and said, I want a Big Mac. I'm the customer. The customer is always right. He can't tell me that he's not going to give me a Happy Meal. Do you see what I'm saying?

{¶ 56} "THE COURT: I understand what you're saying, but it's a big distinction between a court of law from McDonald's or any other fast food.

{¶ 57} "DEFENDANT CLINE: That was just an easy example, you know.

{¶ 58} "THE COURT: But the customer is not always right here. The lawyer has a responsibility to explain the consequences that the individual's beliefs carry. And so it's not unusual that there are differences of opinion.

{¶ 59} "The lawyer is not the judge. The judge is the judge. But the lawyer has to advise the client very carefully. And there are certain things that a client can insist on that the lawyer says, we can't do it that way. Very clear cut case law in that area.

{¶ 60} "I'm not aware that Attorney Feinstein has done anything in his decision making that would jeopardize your rights. I am clearly aware that you're not happy that he's made certain decisions, and that is the reason you've asked for him to be replaced by somebody else. But that choice was not granted by the Court.

{¶ 61} "I'm now faced with the statement that you want to choose to represent yourself rather than have him continue in that role. And that is still where we are to see whether you truly want that, whether you want to exercise that right and assume those responsibilities. If you do, then we proceed in that fashion. If you don't, then Attorney Feinstein will still be your lawyer.

{¶ 62} "I would say for the record that he's consulted with you frequently during jury selection so that you could have input with him on what takes place in the selection of the jury.

{¶ 63} "And if he continues as your lawyer, he would, I'm sure, continue to consult.

{¶ 64} "If you assume the mantle of lawyership, then he will continue to be here in the courtroom to advise you, to respond to your requests for information; but you'll be the one who is in charge of the case and making decisions and making the presentations, making the opening statement.

{¶ 65} "DEFENDANT CLINE: Raising objections, et cetera, et cetera, correct?

{¶ 66} "THE COURT: All those things, yes. He does not have a responsibility to tell you what to do or how to do it unless you ask him and then he responds with his opinion. He's in an advisory capacity, almost protective capacity. That

doesn't mean you're protected. It means that he's in that capacity. You may do things that his protection will be of no avail for you.

{¶ 67} "DEFENDANT CLINE: Could you cite me an example?

{¶ 68} "THE COURT: Appearance you give to the jury, very clear one. A lawyer is trained to present proper appearances to the jury. I don't just mean physical appearance but words used, questions asked, demeanor utilized; and an individual's demeanor may be contrary to the best interests of the individual in any given situation whereas the lawyer might be able to present a different demeanor in presenting issues through witnesses and through evidence.

{¶ 69} "DEFENDANT CLINE: All right.

{¶ 70} "THE COURT: Were there other questions?

{¶ 71} "DEFENDANT CLINE: Not that I'm aware of.

{¶ 72} "THE COURT: Then it's time for the decision.

{¶ 73} "DEFENDANT CLINE: Well, if you're asking me do I want to represent myself, I would say yes.

{¶ 74} "THE COURT: All right. The legal phrase is pro se, it means for self."

{¶ 75} From this point forward, Cline represented himself at his trial, although his previously assigned counsel remained present to respond to Cline's inquiries.

{¶ 76} As we noted in our prior decision, the trial judge did a commendable job of explaining to Cline why it might not be in his best interest to forgo assigned counsel and represent himself. But missing from the colloquy were those explanations, deemed essential in *State v. Martin,* of "the nature of the charges, the statutory offenses included within them, the range of allowable punishments, possible defenses, mitigation, or other facts essential to a broad understanding of the whole matter." Id., 103 Ohio St.3d at 393, 816 N.E.2d 227.

■ {¶ 77} The state argues that Martin's previous offenses gave him a familiarity with criminal law and procedure, so that the trial court was not required to engage in the colloquy envisioned by *State v. Martin.* We are not persuaded. These were complex charges, with possibly complex defenses. And even though the trial court may substitute substantial compliance with Crim.R. 44(A) for literal compliance, it is still the obligation of the trial court, personally, to determine whether a criminal defendant is electing to represent himself, and waive his right to counsel, with a sufficiently broad understanding of the possible consequences to render his decision a knowing, intelligent relinquishment of the right.

{¶ 78} Because we conclude that the trial court erred by accepting Cline's waiver of his right to counsel, and exercise of his right to represent himself,

without substantial compliance with the requirements of Crim.R. 44, his first assignment of error is sustained.

## III

{¶ 79} Cline's second, third, fourth, fifth, and sixth assignments of error are as follows:

{¶ 80} "The trial court erred by refusing to grant appellant a new trial where a juror was a convicted felon.

{¶ 81} "The trial court erred in sentencing appellant to consecutive terms of incarceration by failing to make required findings and statements required pursuant to O.R.C. 2929.14 and 2929.19.

{¶ 82} "The trial court erred and abused its discretion by sentencing appellant to a disproportionate sentence.

{¶ 83} "The trial court erred by imposing a sentence upon appellant in violation of the Eighth Amendment's prohibition on cruel and unusual punishment and Article I, § 9 of the Ohio Constitution.

{¶ 84} "The trial court erred because appellant's convictions were against the manifest weight of the evidence."

{¶ 85} These assignments of error correspond to the first, third, fourth, fifth, and eighth assignments of error set forth in Cline's original brief in this appeal, before the present remand from the Ohio Supreme Court. We treated all these assignments of error as moot in view of our disposition of his second assignment of error in that brief, which corresponds to his first assignment of error in this brief.

{¶ 86} The mandate of the Ohio Supreme Court is set forth in its opinion in this case, which, in its entirety, is as follows: "The judgment of the court of appeals is reversed and the cause is remanded to that court for proceedings consistent with *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, and for consideration of other assignments of error." *State v. Cline*, 103 Ohio St.3d 471, 2004-Ohio-5701, 816 N.E.2d 1069. We construe that mandate as requiring us to reconsider the other assignments of error as necessary to render a complete disposition of this appeal, since the Supreme Court's reversal of our initial disposition created the possibility that those other assignments of error might no longer be moot.

{¶ 87} Because we are sustaining Cline's first assignment of error, we still regard the other assignments of error he asserts in the brief that is presently before us as being moot. Accordingly, his second, third, fourth, fifth, and sixth assignments of error are all overruled as moot.

## IV

{¶ 88} In Cline's original brief in this appeal, before the remand from the Ohio Supreme Court, he included the following two assignments of error (the sixth and seventh assignments of error in that brief):

{¶ 89} "The trial court erred by failing to dismiss the case because the state did not bring defendant to trial within the time limits set forth in Ohio Revised Code 2945.71 et seq.

{¶ 90} "Appellant's convictions were not supported by sufficient evidence."

{¶ 91} We did not treat these assignments of error as moot. The first of these two assignments of error we overruled on its merits. The second we sustained in part and overruled in part, holding that there was insufficient evidence to support Cline's conviction for menacing by stalking under Count 6 of the indictment (one of two menacing-by-stalking counts of which Cline was convicted), because neither he nor anyone acting in concert with him trespassed upon the victim's property, an essential element of that offense. We ordered Cline discharged as to that offense. With respect to all of Cline's other convictions, we found sufficient evidence in the record; therefore, this assignment of error was overruled to the extent that it applied to those other convictions.

{¶ 92} Cline has not reasserted these assignments of error from his original brief in this appeal, before this cause was remanded from the Ohio Supreme Court. Neither has the state, in its current brief, sought to revisit these assignments of error. In its mandate, the Ohio Supreme Court was not specific in its command "for consideration of other assignments of error." We take it that neither Cline nor the State regards this court as being under any obligation to revisit its disposition of these two assignments of error. Neither are we under the impression that we are so obligated.

{¶ 93} If we were obligated to revisit these assignments of error from Cline's original brief, before the remand of this cause from the Ohio Supreme Court, neither party has given us any basis to reconsider our prior disposition of these assignments of error.

{¶ 94} Our disposition of these assignments of error, set forth in Parts IV and V of our opinion rendered September 5, 2003, is incorporated in this opinion, as if fully rewritten herein.

## V

{¶ 95} Cline's first assignment of error having been sustained, his second, third, fourth, fifth, and sixth assignments of error having been overruled as moot, and his seventh assignment of error set forth in his original brief, before this

cause was remanded from the Ohio Supreme Court, having been sustained in part, the judgment of the trial court is reversed, Cline is ordered discharged with respect to his conviction for menacing by stalking under Count 6 of the indictment, and this cause is remanded for further proceedings consistent with this opinion.

                                                        Judgment accordingly.

BROGAN, P.J., and WOLFF, J., concur.